## INDUSTRIAL ASSOCIATION OF SAN FRANCISCO, ET AL. *v.* UNITED STATES

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF CALIFORNIA.

No. 365. Argued March 10, 1925.—Decided April 13, 1925.

For the purpose of freeing the local building industry from domination by trade unions, numerous building contractors and dealers in building materials in San Francisco combined to establish, in effect, the " open shop " plan of employment, by requiring builders who desired building materials of certain specified kinds to obtain permits therefor from a Builders' Exchange, and by refusing such permits to those who did not support the plan. *Held* that the

combination did not violate the Sherman Anti-Trust Act, because

(1) Its object was confined to a purely local matter and interference with interstate commerce was neither intended nor desired. P. 77.

(2) The materials for which permits were required were all produced in California, except one kind as to which permits were required only after they had entered the State and become commingled with the common mass of local property, so that their interstate movement and commercial status had ended. P. 78.

(3) Any interference with the free movement of supplies from other States was incidental, indirect and remote, due merely to lack of demand for such supplies upon the part of builders who, through being unable to purchase the local permit materials, were unable to go on with their jobs. P. 80.

(4) Instances in which it was alleged that persons in other States, were directly prevented or discouraged from shipping into California were either not proven, or were related to a practice abandoned long before the suit was instituted, with no probability of renewal, or were sporadic and doubtful and of so little weight as evidence of the conspiracy alleged as to call for application of the maximum *de minimis non curat lex*. P. 83.

293 Fed. 925, reversed.

APPEAL from a decree of the District Court enjoining the appellant associations, corporations and individuals from conduct found to violate the Anti-Trust Act.

*Mr. H. H. Phleger,* with whom *Messrs. O. K. McMurray, Chauncey F. Eldridge* and *George O. Bahrs* were on the briefs, for appellants.

The evidence shows that certain of the defendants, participants in a local industrial controversy, refused to sell certain state-produced materials and certain supplies which had ceased to be articles in interstate commerce, to those aligned on the opposite side of the industrial controversy; that such refusals were made in San Francisco; that the materials were to be used in San Francisco and vicinity; that there was no intent to affect

interstate commerce, to fix prices or to stifle competition, and that the refusals had in fact no such effect. The defendants contend that this evidence does not establish a violation of the Act for the following reasons:

1. The agreement was not intended to restrain interstate trade; it was not intended to fix prices or restrain competition; it had no commercial or trade purpose.

2. Its effect on interstate commerce was secondary, remote, incidental and slight, if there was any effect at all.

3. The situs and effect of the restraint, if any, were local.

4. The defendants were themselves direct participants in the industrial controversy and committed no unlawful acts.

5. The restraint upon interstate commerce, if any, was not unreasonable.

Participants in an industrial conflict, confined to a single city and vicinity, may refuse to sell building materials in that city, to their opponents for use in that city, and if there is no intent to restrain interstate commerce, and if any effect thereon is slight, incidental and remote, there is no violation of the Anti-Trust Act. The Act condemns only those combinations which directly and unduly restrain interstate commerce. *American Column & Lumber Co.* v. *United States,* 257 U. S. 377–400; *United States* v. *Union P. R. Co.,* 226 U. S. 61.

To come within the inhibitions of the Act, we must find: A restraint of interstate commerce; direct restraint of that commerce; and undue restraint of that commerce. *United States* v. *Knight,* 156 U. S. 1; *Swift & Co.* v. *United States,* 196 U. S. 375; *United Leather Workers* v. *Herkert & Meisel Trunk Co.,* 265 U. S. 457; *Hopkins* v. *United States,* 171 U. S. 578; *Anderson* v. *United States,* 171 U. S. 604. In these cases the court has limited the application of the Act to agreements which exercise

a direct effect upon interstate commerce and where the intent or " dangerous probability " is to restrict that commerce.   The principles marking the limits of direct and undue restraint of interstate commerce receive further illustration from a consideration of the cases in this court under the Anti-Trust Act dealing with labor disputes, a group which may conveniently be termed the *Labor Cases.   Loewe* v. *Lawlor,* 208 U. S. 274; *Duplex Co.* v. *Deering,* 254 U. S. 443; *United Mine Workers* v. *Coronado Coal Co.,* 259 U. S. 344. . See *United Mine Workers of America* v. *Pennsylvania,* 300 Fed. 965; *Finley* v. *United Mine Workers of America,* 300 Fed. 972, 979; *United Leather Workers* v. *Herkert & Meisel Trunk Co., supra.*

In order that a restraint of trade shall be obnoxious to the Act, it must constitute an " undue " restraint. *United States* v. *Standard Oil,* 221 U. S. 1. The decisions of this court have made it clear that agreements which result in the restraint of intrastate, as distinguished from interstate, commerce are not within the Act, and that the court acquires no jurisdication over that part of a combination or agreement which relates to commerce wholly within a State by reason of the fact that the combination also covers commerce which is interstate. *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211.

As to the refusal to sell in San Francisco for use in San Francisco, small quantities of lime and plaster produced in other States, it is equally clear that such refusals did not constitute a violation of the Act.   The goods at the time of the refusals had ceased to be in interstate commerce. *Illinois Cent. Ry.* v. *De Fuentes,* 236 U. S. 157; *Pub. Util. Comm. of Kansas* v. *Landon,* 249 U. S. 236.   The materials here are not like the cattle in the *Swift Case* or in *Stafford* v. *Wallace* (258 U. S. 495)—not in the current of interstate commerce; the tran-

sit had stopped for all time.  The materials were at their ultimate destination, never more to move out into interstate commerce.  *Brown* v. *Huston,* 114 U. S. 622.

The decree is vague, indefinite and uncertain and does not set forth the acts or transactions which are forbidden.  It is a sweeping injunction to obey the law and puts the whole conduct of the defendants at the peril of a summons for contempt.  As to some of the defendants, the evidence wholly fails to show any participation in any of the acts or things complained of or any connection therewith.  The court therefore committed error in entering its decree against such defendants.

*Mr. Augustus T. Seymour,* Assistant to the Attorney General, with whom *Messrs. Henry Anderson Guiler* and *C. Stanley Thompson,* Special Assistants to the Attorney General, were on the brief, for the United States.

The object sought to be accomplished by the defendants was unlawful.  The purpose was to take away from employers the right to employ men upon any other terms than those of the so-called American Plan.  Every employer who joined the combination stripped himself for the time being of the right to run his job upon such terms as he pleased.

The constitutional right of an employer to dispense with the services of an employee because of his membership in a labor union was recognized by this court in *Adair* v. *United States,* 208 U. S. 161, where an Act of Congress was held to be an arbitrary interference with the liberty of contract which no government could legally justify in a free land.  This case was followed in the case of *Coppage* v. *Kansas,* 236 U. S. 1. 'The court expressly limited its consideration to agreements made voluntarily and without coercion or duress and which had no reference to interference with the rights of third parties or the general public (p. 20).  In the case of *Hitchman Coal*

*& Coke Co.* v. *Mitchell,* 245 U. S. 229, 250, it was held that the plaintiff was acting within its lawful rights in employing its men only on terms of continuing non-membership in the United Mine Workers of America, and that both employers and employees have an interest which is entitled to the protection of the law in the freedom of the former to exercise without interference or compulsion his judgment as to whom he shall employ. The present is just such a case where the defendants joined in a combination to compel third persons and strangers to submit to certain limitations in their employment of labor. The elements of combination and coercion are both present.

The means employed by the defendants to accomplish their object directly restrained interstate commerce. The effect of the combined trade controlled was a threat to manufacturers of building materials outside of the State which was intended to, and which did in fact, restrain them from shipping building materials to "black listed" dealers and contractors and "ineligibles."

Nor was the cooperation of contractors in adopting the American Plan voluntary. They were forced to adopt that plan under penalty of not obtaining permits and not obtaining building material. They were required to sign pledges of allegiance to the conspiracy. That such an agreement is in restraint of trade is undeniable, whatever the motive or necessity which has induced the compact.

The real contention of appellants is that the defendants did not intend to restrain interstate commerce and that their acts did not involve any unreasonable and undue restraint of such trade or commerce. That contention presents a question of fact, the solution of which must be arrived at by a consideration of the evidence. The principle, however, is clearly established that any combination which seeks to compel third persons and strangers not to engage in a course of trade except upon con-

ditions which the members of the combination impose is
an agreement in restraint of trade within the meaning
of the Sherman Anti-Trust Act. *Gompers* v. *Buck's Stove
& Range Co.* 221 U. S. 418; *Loewe* v. *Lawlor*, 208 U. S.
274; *Eastern States Retail Lumber Dealers Assn.* v.
*United States*, 234 U. S. 600; *Montague* v. *Lowry*, 193
U. S. 38; *Duplex Co.* v. *Deering*, 254 U. S. 443. The very
circulation of information among the manufacturers lo-
cated in States other than California of the names of
contractors and builders or dealers who were not operat-
ing upon the American Plan or who refused to pledge
themselves to operate upon that plan, was intended to
have the natural effect of causing such manufacturers to
withhold sales and shipments from the concerns so listed.
The obstruction and restraint of a scheme like this were
illustrated in *Grenada Lumber Co.* v. *Mississippi*, 217
U. S. 433, which did not involve a question of interstate
commerce. See *Federal Trade Comm.* v. *Raymond Co.*,
263 U. S. 565.

The real gist of the conspiracy here was the use of
force to coerce manufacturers outside of the State to
withhold the materials manufactured by them from any-
one within the State who did not submit to the will of the
conspirators. The power of defendants is shown by a stip-
ulation in the record that 90 per cent of the new build-
ing work in San Francisco was being done by members
of the defendant. Under the decisions above cited, it
was enough if the natural tendency of the acts done by
the defendants was to cause the manufacturers from
without the State to withhold shipments from builders
and contractors who refused to operate upon the Ameri-
can Plan. The vice of defendants' plan was in prevent-
ing building materials being distributed in the natural
course of trade. The restraint on interstate commerce
was material. In determining whether interstate com-
merce is involved in this case it is not necessary to con-

sider the decisions of this court in *United States* v. *E. C. Knight Co.,* 156 U. S. 1; *Hopkins* v. *United States,* 171 U. S. 578; *Anderson* v. *United States,* 171 U. S. 604. The distinction between those cases and one like the present case was pointed out in the opinion of *Montague* v. *Lowry,* 193 U. S. 38, at page 48, and in *Stafford* v. *Wallace,* 258 U. S. 495, at page 524. Nor is it important to consider cases like *Coe* v. *Errol,* 116 U. S. 517; *Kidd* v. *Pearson,* 128 U. S. 1; *Leisy* v. *Hardin,* 135 U. S. 110, 116, and other decisions which draw the line where interstate commerce commences and where it ends. See *Binderup* v. *Pathe Exchange,* 263 U. S. 291. The cases of *United Mine Workers of America* v. *Coronado Coal Co.,* 259 U. S. 344, and *United Leatherworkers International Union* v. *Herkert & Meisel Trunk Co.,* 265 U. S. 457, are both distinguishable from this case by the fact that the restraints involved in them related to the prevention of manufacture as distinguished from interference with the distribution of commodities after they had been manufactured.

Mr. Justice Sutherland delivered the opinion of the Court.

This is a suit by the United States against a number of voluntary associations, corporations and individuals, charging them with engaging, and threatening to continue to engage, in a conspiracy to restrain trade and commerce in building materials among the several states, in violation of the Anti-Trust Act of July 2, 1890, c. 647, 26 Stat. 209. The bill prays for an injunction restraining the further execution of the alleged conspiracy, for a dissolution of certain of the associations as illegal, and for other relief. After a hearing, the federal district court declined to dissolve any of the appellants or interfere with their general activities, but entered a decree enjoining them specifically from (a) requiring any permit for the pur-

chase, sale or use of building materials or supplies produced without the State of California and coming into that state in interstate or foreign commerce; (b) making, as a condition for the issuance of any permit for the purchase, sale or use of building materials or supplies, any regulations that will interfere with the free movement of building materials, plumbers' or other supplies produced without the state; (c) attempting to prevent or discourage any person without the state from shipping building materials or other supplies to any person within the state; or (d) aiding, abetting or assisting, directly or indirectly, individually or collectively, others to do any of the foregoing matters or things. 293 Fed. 925. A reversal of this decree is sought upon the ground, mainly, that the evidence wholly fails to show any contract, combination or conspiracy in restraint of interstate or foreign trade or commerce, or a violation in any respect of the provisions of the Anti-Trust Act. Other grounds assigned, in view of the conclusion we have reached, we put aside as unnecessary to be considered.

That there was a combination and concerted action among the appellants, is not disputed. The various agreements, courses of conduct and acts relied upon to establish the case for the government arose out of a long continued controversy,—or, more accurately, a series of controversies,—between employers engaged in the construction of buildings in San Francisco, upon the one side, and the building trade unions of San Francisco, of which there were some fifty in number with a combined membership of about 99% of all the workmen engaged in the building industries of that city, upon the other side.

Prior to February 1, 1921, the unions had adopted and enforced, and were then enforcing, many restrictions bearing upon the employment of their members, which the employers, and a large body of other citizens, considered to be unreasonable, uneconomic and injurious to

the building industries, resulting, it was asserted, in decreased production, increased cost and generally retarded progress. Among the restrictions complained of, were rules limiting the number of apprentices, limiting the amount of work, limiting or forbidding the use of labor-saving devices, and interfering with the legitimate authority of the employer. The plumbers' union, for example, enforced the following, among others: no union plumber, whatever the emergency, was permitted to work on non-union material or to work overtime on Saturday without permission of the union; detailed reports were required showing the number of fixtures set each day, and men who exceeded the standard fixed by the union were disciplined; the time which any employer was permitted to stay on a job was limited to two hours a day; as many men as the union saw fit could be ordered on a job regardless of the wishes of the employer. Among the restrictions imposed by the painters' union were these: wide brushes with long handles for roof painting were prohibited, and it was required that all such work should be done with a small brush; certain labor-saving devices were prohibited; and union painters declined to paint non-union lumber.

The unions rigidly enforced the " closed shop,"—that is, they denied the right of the employer to employ any workman, however well qualified, who was not a member of a San Francisco union; and this applied to a member of a labor union in another locality, who, moreover, practically was precluded from joining a San Francisco union by reason of the cost and onerous conditions imposed. They were confederated under the name of the Building Trades Council, by means of which their combined power was exerted in support of the demands and policies of each, until they had acquired a virtual monopoly of all kinds of building trade labor in San Francisco, and no building work of any consequence could be done in that

city, except in subordination to these demands and policies.

Early in 1921, serious differences having arisen between the unions and the employers in respect of wages, hours and working conditions, an agreement for arbitration was made and a board of arbitrators selected. The board, after a hearing, made a tentative award reducing the scale of wages for the ensuing six months. Challenging the authority of the board to reduce wages, the unions refused to be bound by the award and repudiated and abandoned the arbitration. Strikes ensued; efforts to bring the strikers back to work failed; and building operations in San Francisco practically came to a stand-still. Thereupon, in an endeavor to find a solution of the difficulty, mass-meetings were held by representative citizens in large numbers and from all walks of life. At these meetings it was resolved that the work of building must go forward, and that if San Francisco mechanics refused to work, others must be employed from the outside. Funds were raised and placed in the hands of a committee of the San Francisco Chamber of Commerce, and, under its direction, workmen were brought in from the outside with promises of employment at the wages fixed by the arbitrators. Subsequently, the Industrial Association of San Francisco was organized to take the place of the committee and carry on its work. The strikers, however, returned to work, and for a time no objection was made to the employment of nonunion workmen. But later, demands were made by certain of the unions for the discharge of all non-union workmen and the restoration of the " closed shop." These demands were disregarded, and there was another strike. A boycott was instituted and acts of violence against persons and property committed. In the meantime, one of the appellants, the Builders Exchange of San Francisco, with a membership of more than one thousand building contractors and deal-

ers in building materials, in coöperation with the Industrial Association and other appellants, devised and put into effect what is called the " American plan."

The basic requirement of the plan was that there should be no discrimination for or against an employee on account of his affiliation or non-affiliation with a labor union, except that at least one non-union man in each craft should be employed on each particular job as an evidence, it is suggested, of good faith. In effect, the " American plan" and the " open shop" policy are the same.

The principal means adopted to enforce the plan was the " permit system," the object of which was to limit sales of certain specified kinds of materials to builders who supported the plan. To render this restriction effective, the person concerned was required to obtain a permit from the Builders Exchange, specifying the kinds and quantities of materials to be furnished and the particular job on which they were to be used. The materials specified were cement, lime, plaster, ready-mixed mortar, brick, terra cotta and clay products, sand, rock and gravel. Substantially all of these were California productions and were deliberately selected for that reason, in order to avoid interference with interstate commerce. The only material exception was plaster, which was brought in from the outside, but consigned to local representatives of the manufacturers or to local dealers in San Francisco, and brought to rest in salesrooms and warehouses and commingled with other goods and property, before being subjected to the permit rule. A suggestion was made at one time that, if necessary, the rule would be extended to all other materials used in the building trades; but it does not appear that this was done. It is said that lath of various kinds, wallboard and Keene cement also were put under the rule; but we think the record discloses that, in fact, this was never agreed upon or carried into effect.

There is evidence of efforts to extend the "American plan" to other cities and states. Permits were extensively withheld in respect of buildings where the "American plan" was not adopted or not enforced. Builders and contractors were constantly urged to observe the plan and were warned that failure to do so would result in a denial of future permits. A check was kept upon shops and building jobs by inspectors, and daily reports were made as to whether the plan was being observed. Whenever it appeared in any case that the plan was not being lived up to, a warning letter was sent out. Under appropriate by-laws, members of organizations subscribing to the plan who violated it were fined and in some instances expelled; and other methods, not necessary to be recited, in part persuasive and in part coercive, were adopted and enforced in order to secure a thoroughgoing maintenance of the plan.

With the conflict between the policy of the "closed shop" and that of the "open shop," or with the "American plan," *per se,* we have nothing to do. And since it clearly appears that the object of the plan was one entirely apart from any purpose to affect interstate commerce, the sole inquiry we are called upon to make is whether the means employed to effectuate it constituted a violation of the Anti-Trust Act; and, in the light of the evidence adduced, that inquiry need be pursued little beyond a consideration of the nature of the permit system, what was done under it, and the effect thereof upon interstate commerce.

The bases of the decree, which, in the opinion of the court below, were established, may be briefly and categorically stated as follows:

1. Permits were required for the purchase of building materials and supplies produced in and brought from other states into California.

2. Permits, even if limited to California produced materials, nevertheless, interfered with and prevented the

free movement of building materials and supplies from other states into California.

3. Persons in other states were directly prevented or discouraged from shipping building materials and supplies into California.

It will be well, *in limine,* to emphasize certain clearly established general facts, in the light of which those grounds must be considered. Interference with interstate trade was neither desired nor intended. On the contrary, the desire and intention was to avoid any such interference, and, to this end, the selection of materials subject to the permit system was substantially confined to California productions. The thing aimed at and sought to be attained was not restraint of the interstate sale or shipment of commodities, but was a purely local matter, namely, regulation of building operations within a limited local area, so as to prevent their domination by the labor unions. Interstate commerce, indeed commerce of any description, was not the object of attack, " for the sake of which the several specific acts and courses of conduct were done and adopted." *Swift and Company* v. *United States,* 196 U. S. 375, 397. The facts and circumstances which led to and accompanied the creation of the combination and the concert of action complained of, which we have briefly set forth, apart from other and more direct evidence, are " ample to supply a full local motive for the conspiracy." *United Mine Workers* v. *Coronado Co.,* 259 U. S. 344, 411.

But it is not enough that the object of a combination or conspiracy be outside the purview of the act, if the means adopted to effectuate it directly and unduly obstruct the free flow of interstate commerce. The statute is not aimed alone at combinations and conspiracies which contemplate a restraint of interstate commerce, but includes those which directly and unduly cause such restraint in fact. See *American Column Co.* v. *United*

States, 257 U. S. 377, 400; *Eastern States Lumber Ass'n.*
v. *United States*, 234 U. S. 600, 613.

It remains to apply these principles, in the light of
the facts, to the several grounds above stated, upon which
the decree rests.

*First: That permits were required for the purchase of
materials produced in and brought from other states.*
To the extent that this may imply that permits were
required in respect of building materials or supplies pro-
duced outside the State of California and shipped into
the state, it is not sustained by the evidence. The
record contains two letters signed by the president of
the Builders Exchange to the effect, in one, that there
" are added," and, in the other of later date, that " it is
now necessary to add to the permit system," other ma-
terials than those in the enumerated list; and the person
addressed in the second is asked to govern himself ac-
cordingly. But the positive, uncontradicted evidence is
that, in fact, permits were required for the originally
listed materials and for nothing else. While about
twenty-eight thousand permits in all were issued, there
is a significant absence of evidence that any of them so
issued related to other than such listed materials. Upon
the proof, we reasonably cannot accept the view that
these letters are enough to show a departure from the
declared and established purpose of the movement on
the whole to avoid interference with interstate trade by
confining the permit system substantially to California
produced articles.

It is true, however, that plaster, in large measure pro-
duced in other states and shipped into California, was on
the list; but the evidence is that the permit requirement
was confined to such plaster as previously had been
brought into the state and commingled with the common
mass of local property, and in respect of which, there-
fore, the interstate movement and the interstate commer-

cial status had ended. This situation is utterly unlike that presented in the *Swift Case, supra,* where, the only interruption of the interstate transit of live stock being that necessary to find a purchaser at the stockyards, and this the usual and constantly recurring course, it was held (pp. 398–399) that there was thus constituted " a current of commerce among the States," of which the purchase was but a part and incident. The same is true of *Stafford* v. *Wallace,* 258 U. S. 495, 516, which likewise dealt with the interstate shipment and sale of live stock. The stockyards, to which such live stock was consigned and delivered, are there described, not as a place of rest or final destination, but as " a throat through which the current flows," and the sale as only an incident which does not stop the flow but merely changes the private interest in the subject of the current without interfering with its continuity. In *Binderup* v. *Pathe Exchange,* 263 U. S. 291, 309, a commodity produced in one state was consigned to a local agency of the producer in another, not as a consummation of the transit, but for delivery to the customer. This court held that the intermediate delivery did not end, and was not intended to end, the movement of the commodity, but merely halted it " as a convenient step in the process of getting it to its final destination."

But here, the delivery of the plaster to the local representative or dealer was the closing incident of the interstate movement and ended the authority of the federal government under the commerce clause of the Constitution. What next was done with it, was the result of new and independent arrangements.

In respect of other materials of the character of those on the selected list, brought from other states, it is enough to say that the quantities were not only of little comparative consequence but it is not shown that they were subjected to the permit rule.

*Second: That the permit requirement for California produced materials interfered with the free movement of materials and supplies from other states.* No doubt there was such an interference, but the extent of it, being neither shown nor perhaps capable of being shown, is a matter of surmise. It was, however, an interference not within the design of the appellants, but purely incidental to the accomplishment of a different purpose. The court below laid especial stress upon the point that plumbers' supplies, which for the most part were manufactured outside the state, though not included under the permit system, were prevented from entering the state by the process of refusing a permit to purchase other materials, which were under the system, to anyone who employed a plumber who was not observing the "American plan." This is to say, in effect, that the building contractor, being unable to purchase the permit materials, and consequently unable to go on with the job, would have no need for plumbing supplies, with the result that the trade in them, to that extent, would be diminished. But this ignores the all important fact that there was no interference with the freedom of the outside manufacturer to sell and ship or of the local contractor to buy. The process went no further than to take away the latter's opportunity to use, and, therefore, his incentive to purchase. The effect upon, and interference with, interstate trade, if any, were clearly incidental, indirect and remote,—precisely such an interference as this court dealt with in *United Mine Workers* v. *Coronado Co., supra,* and *United Leather Workers* v. *Herkert,* 265 U. S. 457.

In the *Coronado Case* there was an attempt on the part of the owners of a coal mine to operate it upon the " open shop " basis. The officers and members of a local miners' union, thereupon, engaged in a strike, which was carried on with circumstances of violence resulting in the destruction of property and the injury and death of persons. A

conspiracy and an intent to obstruct mining operations were established, and it was proved that the effect thereof was to prevent a part of the product of the mine from going into interstate commerce. It was held that this would not constitute a conspiracy to restrain such commerce, in the absence of proof of an intention to restrain it or proof of such a direct and substantial effect upon it, that such intention reasonably must be inferred. It was pointed out that there was nothing in the circumstances or declarations of the parties to indicate that the strikers had in mind any interference with interstate commerce or competition, when they engaged in the attempt to break up the plan to operate the mines with non-union labor, and, conceding that the natural result would be to keep the preponderating part of the output of the mine from being shipped out of the state, the effect on interstate commerce was not of such substance that a purpose to restrain interstate commerce might be inferred.

In the *United Leather Workers Case* there was a strike, accompanied by illegal picketing and intimidation of workers, to prevent, and which had the effect of preventing, the continued manufacture of goods by a trunk company. It was held that this was not a conspiracy to restrain interstate commerce within the Anti-Trust Act, even though the goods, to the knowledge of the strikers, were to be shipped in interstate commerce to fill orders already received and accepted from the company's customers in other states, since there was no actual or attempted interference with their transportation to, or their sale in, such states. There is in this case a complete review of the prior decisions on the subject, upon which the Court concludes (p. 471):

" This review of the cases makes it clear that the mere reduction in the supply of an article to be shipped in interstate commerce, by the illegal or tortious prevention of

its manufacture, is ordinarily an indirect and remote obstruction to that commerce. It is only when the intent or necessary effect upon such commerce in the article is to enable those preventing the manufacture to monopolize the supply, control its price or discriminate as between its would-be purchasers, that the unlawful interference with its manufacture can be said directly to burden interstate commerce. . . .

" We concur with the dissenting Judge in the Circuit Court of Appeals when, in speaking of the conclusion of the majority, he said: ' The natural, logical and inevitable result will be that every strike in any industry or even in any single factory will be within the Sherman Act and subject to federal jurisdiction provided any appreciable amount of its product enters into interstate commerce.' "

In its essential features, the present case is controlled by this reasoning. If an executed agreement to strike with the object and effect of closing down a mine or a factory, by preventing the employment of necessary workmen, the indirect result of which is that the sale and shipment of goods and products in interstate commerce is prevented or diminished, is not an unlawful restraint of such commerce, it cannot consistently be held otherwise in respect of an agreement and combination of employers or others to frustrate a strike and defeat the strikers by keeping essential domestic building materials out of their hands and the hands of their sympathizers, because the means employed, whether lawful or unlawful, produce a like indirect result. The alleged conspiracy and the acts here complained of, spent their intended and direct force upon a local situation,—for building is as essentially local as mining, manufacturing or growing crops,—and if, by a resulting diminution of the commercial demand, interstate trade was curtailed either generally or in specific instances, that was a fortuitous consequence so remote and indirect as plainly to cause it to fall outside the reach of the Sherman Act.

The Government relies with much confidence upon *Loewe* v. *Lawlor*, 208 U. S. 274, and *Duplex Co.* v. *Deering*, 254 U. S. 443; but the facts there and the facts here were entirely different. Both cases, like the *Coronado* and the *United Leather Workers* cases and the present case, arose out of labor disputes; but in the former cases, unlike the latter ones, the object of the labor organizations was sought to be attained by a country-wide boycott of the employer's goods for the direct purpose of preventing their sale and transportation in interstate commerce in order to force a compliance with their demands. The four cases and the one here, considered together, clearly illustrate the vital difference, under the Sherman Act, between a direct, substantial and intentional interference with interstate commerce and an interference which is incidental, indirect, remote, and outside the purposes of those causing it.

*Third: That persons in other states were directly prevented or discouraged from shipping into California.* In respect of the alleged instances of direct interference with interstate sales and shipments, the evidence is sharply conflicting, with the preponderance in most cases, we think, on the side of appellants. In many of them the interferences had no connection with the " American plan " or the system and efforts employed to effectuate it, but were in furtherance of independent trade policies or other isolated and disconnected purposes. One such case was that of the Golden Gate Building Material Company, consisting of five plastering contractors, where the basis of the refusal to accept orders for supplies was a protest by certain dealers that the company was buying for individual use and not for resale, and had been formed merely to obtain dealers' prices. A class of interferences strongly pressed in argument was that in respect of plumbing supplies, practically all of which were manufactured outside of the State of California. Lists of plumbing con-

tractors who were not observing the "American plan" were sent to the plumbing supply houses, and some of them refused to sell materials to such contractors. That there was, at least, a sympathetic connection between this action and the "American plan" may be assumed, although plumbing supplies were not within the scope of the permit list. However this may be, and whatever may have been the original situation, the practice was abandoned long before the present suit was instituted, and nothing appears by way of threat or otherwise to indicate the probability of its ever being resumed. Under these circumstances, there is no basis for present relief by injunction. *United States* v. *U. S. Steel Corp.,* 251 U. S. 417, 444–445.

By the foregoing process of elimination, the interferences which may have been unlawful are reduced to some three or four sporadic and doubtful instances, during a period of nearly two years. And when we consider that the aggregate value of the materials involved in these few and widely separated instances, was, at the utmost, a few thousand dollars, compared with an estimated expenditure of $100,000,000 in the construction of buildings in San Francisco during the same time, their weight, as evidence to establish a conspiracy to restrain interstate commerce or to establish such restraint in fact, becomes so insignificant as to call for the application of the maxim, *de minimis non curat lex.* To extend a statute intended to reach and suppress real interferences with the free flow of commerce among the states, to a situation so equivocal and so lacking in substance, would be to cast doubt upon the serious purpose with which it was framed.

The decree of the court below must be reversed and the cause remanded with instructions to dismiss the bill.

*Decree reversed.*