## UNITED STATES v. SOUTHERN CALIFORNIA WHOLESALE GROCERS' ASS'N et al.

(District Court, S. D. California, S. D. August 28, 1925.)

**1. Conspiracy ⟨≈⟩47—Evidence in defense not necessarily to be viewed with suspicion.**

While it is true that conspirators work in secret and under cover to effect their purpose, it is not a fair rule that, under every charge of conspiracy, the evidence in defense must be viewed with suspicion and distrust.

**2. Monopolies ⟨≈⟩17(1)—Independent use by salesmen of association price lists in making sales in other states held not in violation of Anti-Trust Act; "combination in restraint of trade."**

A wholesale grocers' association, which prepared a price list, revised from time to time, to which its members were required to conform in making sales within the state, which comprised its chief sales territory, held not a "combination in restraint of interstate trade" in violation of Sherman Anti-Trust Act (Comp. St. § 8820 et seq.), though such price list was used by salesmen of its members as a basis in making sales in other states, where such use was independent of the association, and not required by its use, and the salesmen were not required to and did not follow it in making sales in the outside territory.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Combination in Restraint of Trade.]

**3. Monopolies ⟨≈⟩17(1)—Combination of dealers to regulate prices not necessarily unreasonable or illegal.**

Not every regulation of dealers in combination, which affects the prices of commodities to consumers, results in the enhancement of prices in general or constitutes an unreasonable restraint of trade.

**4. Monopolies ⟨≈⟩17(1)—Action which only incidentally affects interstate commerce not within Anti-Trust Act.**

That the action of an association of local dealers, which was intended to, and does, affect directly only local business, may incidentally and indirectly affect interstate commerce, does not render it illegal as in violation of Sherman Anti-Trust Act (Comp. St. § 8820 et seq.).

**5. Monopolies ⟨≈⟩17(1)—Distribution by wholesale association to members of lists of nonpaying customers held not illegal.**

That a wholesale grocers' association distributed to its members, merely for their information, lists of retailers who were reported as having failed to pay their bills for merchandise, held not a violation of Sherman Anti-Trust Act (Comp. St. § 8820 et seq.).

**6. Monopolies ⟨≈⟩17(1)—Attempts by combined wholesale dealers to induce manufacturers not to sell direct to retailers held in violation of Anti-Trust Act.**

Attempts by an association of wholesale grocers and of brokers, to deter manufacturers and producers from selling direct to chain stores, held in violation of Sherman Anti-Trust Act (Comp. St. § 8820 et seq.).

In Equity. Suit by the United States against the Southern California Wholesale Grocers' Association and others. Decree for complainant in part.

James M. Beck, Acting Atty. Gen., A. T. Seymour, Asst. Atty. Gen., Henry A. Guiler, Sp. Asst. Atty. Gen., Herbert N. Ellis, Sp.

Asst. U. S. Atty., of Los Angeles, Cal., and Harry H. Atkinson, Sp. Asst. Atty. Gen, for the United States.

Lawler & Degnan, of Los Angeles, Cal., for defendant Southern California Wholesale Grocers' Ass'n.

Flint & MacKay, of Los Angeles, Cal., for defendant Southern California Ass'n of Manufacturers' Representatives.

Wright & McKee, of San Diego, Cal., for defendants Delta Mercantile Co. and Klauber-Wangenheim Co.

JAMES, District Judge. By the bill in equity, filed herein on April 2, 1924, on behalf of the United States, defendants are charged with having engaged in a conspiracy to restrain trade and commerce, contrary to the provisions of section 1 of the Act of Congress approved July 2, 1890, commonly referred to as the Sherman Anti-Trust Law (Comp. St. § 8820). It is alleged that the illegal acts were engaged in for a period of three years prior to the filing of the bill of complaint, and that the defendants continue therein. An injunction is prayed for to restrain the defendants from further continuing in the alleged conspiracy. The government further asks that by the decree the voluntary associations named as defendants be dissolved, and that the members thereof be enjoined from again organizing any like or similar "association, exchange, corporation, company, or concern." In the complaint there are described a series of acts which it is alleged the defendants, by concert and agreement, have done and agreed to do, all of which it is charged were and are in violation of the prohibitory terms of the law referred to.

The business of all of the defendants, as the bill of complaint describes it, has to do with the transportation, handling, and marketing of staple lines of groceries.

The defendants may be divided into two general classes: First, The Southern California Wholesale Grocers' Association and its members; that organization being engaged in handling in wholesale quantities, and distributing to retail dealers, grocery commodities. Second, the organization and its members once called the Southern California Association of Manufacturers' Representatives and now known as the Los Angeles Food Brokers' Association; that organization being a brokerage concern and an intermediary between the manufacturer and the jobber or wholesaler. The two principal associations named operate separately, and their organizations are distinct. The bro-

7 F.(2d)—60

kers' field of patronage necessarily is limited to the wholesalers or jobbers, who in turn confine their market to the retailer.

The charge of the government may be very generally summarized as follows: (1) That the defendants by their organizations and through various means sought to monopolize the business of distribution of commodities referred to and to enhance the prices charged; (2) that, as a part of the plan, and as effective means to the end sought, they influenced manufacturers to refuse to sell directly to other distributors, particularly to what are called the "chain stores," and refused to buy from any manufacturer who did so sell to independent buyers.

The testimony and exhibits offered in this case fill many hundreds of pages; the trial having lasted approximately four weeks. It will not be of any advantage to attempt to present more than the briefest summary of the evidence addressed to the pivotal propositions involved. The decision in this case is to be controlled by that evidence, and the inferences legally deducible therefrom, which affect the questions as to whether, by the maintaining of uniform prices by the wholesalers' association, and the action of the wholesalers and brokers in discouraging the manufacturers from selling to the chain stores, interstate commerce was interfered with.

It was admitted that, in the commodities described in the complaint and dealt in by the defendants, a substantial volume was carried into and out of the state of California to and from the Southern District thereof. The bulk or greater quantity of such commodities brought into the state was disposed of by marketing to retailers in Southern California. The wholesalers made no attempt to secure a market in California outside of the principal southern counties, but several of them had a small trade in Arizona, with some sales in the state of Nevada. The testimony was that from several of the wholesaler members shipments to points outside of the state amounted to from 3 to 5 per cent. of their gross business.

The wholesalers' association issued a regular price list which was in the hands of all of the salesmen; the prices contained in which each member was bound to maintain. The testimony was that the maintaining of this list was compulsory only within the territory comprising Southern California, and that traveling representatives of the different members soliciting business in Arizona and Nevada were not required to use it, although it was shown that they did car-

ry it and looked to its quotations as furnishing a general basis for the price charged. There was evidence that in the outside territory those prices were followed, and there was evidence that there were exceptions when different prices were made. The association fixed a summer vacation period of about a week, during which time no salesman was allowed to solicit trade. This vacation period was observed both as to the representatives of the wholesalers working in Southern California and those working in Arizona and Nevada. Members of the wholesalers' association made a cash deposit with the secretary, against which fines might be levied in the judgment of the secretary where a violation of the regulations of the association had been committed, including deviations from the price schedule. It may be here pertinent to state, in view of certain decisions referred to hereinafter, that, all of the evidence being considered, it cannot be found as a fact that the prices charged by the wholesalers and fixed in their schedules were excessive, or the profits accruing disproportionate to a fair and reasonable return from the business when handled and managed with reasonable prudence and economy.

[1] Counsel for the government contend, in relation to the wholesalers and their price-fixing agreement, that interstate restraint of trade in the commodities concerned would result whether there were any shipments out of the state or not; secondly, that, if the lists were used and prices maintained outside of the state, this outflowing commerce would, without question, be restricted. The court is asked to conclude, from the fact that the acknowledged effort of the wholesalers was to maintain schedule prices among their members, and from the fact that the list prices were used as a basis by the traveling men working in Arizona and Nevada, together with the fact that a vacation period was observed in the trade territory outside of the state, that necessarily the understanding and agreement was to make effective the price-fixing plan in the outside territory as well as in the state of California. To reach this conclusion we must give no weight to the affirmation of the wholesalers themselves that prices were not maintained outside of the District of Southern California; also give no effect to the fact as shown that there were variations made by member wholesalers in Arizona and Nevada from the schedule price list; also discard from consideration the fact that some issues at least of the price lists bore upon their face the printed notice that the prices appended were effective only

in Southern California. Such a conclusion is justified only by adopting the assumption that every operation of the wholesalers in the prosecution of their business and the securing of profits is clouded with suspicion and doubt as to the good faith of their asserted efforts to keep within the law, and that the exceptional circumstances shown regarding the business done in other states are self-created for the purpose only of deceiving the government and giving a fair color to a business intentionally operated in violation of law. The implication involved is not only of fraudulent practice but of perjury before the court. True it is that conspirators work secretly and under cover to effect their purpose, but it is not a fair rule which would declare that under every charge of conspiracy the evidence in defense must be viewed with suspicion and distrust.

[2] A like condition as to the use of price lists was represented by the evidence in Pacific States Paper Trade Asociation et al. v. Federal Trade Commission, decided by the Circuit Court of Appeals for the Ninth Circuit (4 F.[2d] 457). The court disposed of the contention of the government that the use by salesmen, traveling out of the state within which the trade association was located, of the same list which was made obligatory within the state, established the charge that interstate trade was restrained and affected, by saying: "The use of a price list of some kind for the information and guidance of salesmen in taking orders and making sales is almost a necessity, and it is going very far to say that the mere use, without combination or agreement, of a particular price list, which the salesmen are not bound to follow, and which differs or may differ from the price lists used by other salesmen in the same locality, has such a tendency to fix prices or limit competition as to bring it within the condemnation of the Anti-Trust Act."

There is necessary to be considered the agreement of the wholesalers to maintain within the Southern District of California the scheduled price for grocery merchandise. That there was such an agreement, and that it was observed by practically all of the members of the wholesalers' association, is admitted. On their part, the grocers have represented by the evidence produced in their behalf that, after the war, there was a situation of great instability in the market, that competition was carried to the extent of being ruinous to that trade, and that the business of supplying the wants of those who looked to them for their merchandise was

insecure and hazardous. This condition was, they have told us, one which belonged to the unsettled, after the war time. They claim that through the work of their association, including the maintaining of price schedules, the business was brought to a condition which was stable. The evidence here was not that a scale of prices was put into effect and designed to be maintained indefinitely and arbitrarily, without regard to market conditions of supply and demand. On the contrary, it was shown that those schedules were changed and corrected at frequent intervals.

[3] In considering the Sherman Anti-Trust Act and its restraining demand against combinations formed to fix prices on commodities traveling in interstate commerce, a student of legislation is apt to form the hasty opinion that, wherever the consumer of any such commodity is affected in the price paid by a lessening of any sort of competition among the sellers through their combination or agreement, the act perforce has been violated. Students of the world of trade, as have students of tariffs and freight rates, looking farther than the simple result first mentioned, have found that there are many other factors to be considered, all involved in the great problem of preserving the balance between supply and demand and promoting the interests alike of those who produce, those who consume, and the intermediary agencies of distribution necessarily involved. A dealer handling a variety of merchandise may select a single commodity, and, because of the power of his financial backing and the volume of his business, depress the price to the consumer until it represents less than the cost to the seller. Plainly he would not conduct business at a loss and involve all commodities of his stock at one time in exploits of that kind, and yet price cutting to the extent mentioned on the one article, for the time being might demoralize trade in that article and jeopardize the business of innumerable dealers engaged in the handling of the commodity. Can it be said that the more numerous dealers, not conditioned so as to stand a loss on the commodity, for the purpose of preventing widespread demoralization of the price, may not band themselves together and in combination—and in defense of their very existence in the trade —fix a price on the article or commodity which shall return to them a reasonable profit over a just and fair handling cost, even though such action on their part may have some tendency to affect interstate shipments supplying the article to their locality?

[4] In interpreting the Sherman Anti-Trust Act, the courts have consistently defined the restrain of commerce which falls within its prohibition as being "undue restraint," and in considering price agreements have condemned those which established "arbitrary" schedules—prices out of relation with reasonable profits, conditions of supply and demand being kept fully in view.

Cases decided within recent months by the Supreme Court of the United States, to my mind may be said to fairly express the view just stated. I refer particularly to Industrial Association of San Francisco et al. v. U. S., 45 S. Ct. 403, 69 L. Ed. ——; Cement Manufacturers' Protective Association et al. v. U. S., 45 S. Ct. 586, 69 L. Ed. ——; Maple Flooring Manufacturers' Association et al. v. U. S., 45 S. Ct. 578, 69 L. Ed. ——, decided in April and June of this year, and printed in advance sheets of the court's opinions.

In the Industrial Association Case the court further remarked: "The alleged conspiracy and the acts here complained of, spent their intended and direct force upon a local situation—for building is as essentially local as mining, manufacturing or growing crops—and if, by a resulting diminution of the commercial demand, interstate trade was curtailed either generally or in specific instances that was a fortuitous consequence so remote and indirect as plainly to cause it to fall outside the reach of the Sherman Act."

The court referred to four other cases previously decided and said: "The four cases and the one here, considered together, clearly illustrate the vital difference, under the Sherman Act, between a direct, substantial, and intentional interference with interstate commerce and an interference which is incidental, indirect, remote, and outside the purposes of those causing it."

Plainly, the acts of the wholesale grocers' association in the use of price schedules were concerned with a local situation and confined to the southern counties of California only. The intentional and moving design was not to regulate or affect the incoming commerce nor to lessen the demand for the commodities dealt in. If the demand was diminished because of the price, then that effect was, as the Supreme Court said in the Industrial Association case, "incidental, indirect, remote, and outside the purposes of those causing it."

The logic of the conclusions expressed in the foregoing can hardly be challenged,

unless it must be said that the business of the broker and that of the wholesaler constitute mere obstructions in the current of distribution between the manufacturer or producer and the retailer. Those agencies have long been deemed legitimate and useful aids in the general business of supplying commodities to consumers. If we are to say that manufacturers should always go direct to the retailer, with the cost and trouble of maintaining extensive and widespread sales forces, warehouses, and distributing agencies, as adjuncts to their business as manufacturers or producers, then why not advance the last step and eliminate also the retailer? Plainly, if the intermediaries are of no service in securing better distribution of products and commodities, they would be retired from the field of trade under the inexorable rule that, where no demand is present, then business will cease. Then, too, it is a question that can be answered only by a specialist possessed of a fund of information not spread before us in the record of this case, as to whether the distributing organization of the producer or manufacturer, if so made as to cover the full retail trade, would result in lessening the ultimate cost price to the consumer, assuming for the moment that that factor alone would determine the result here.

[5] One of the items of evidence which the government urged as showing illegal acts on the part of the wholesale grocers' association was the issuance and distribution among members of lists of names of retailers who had been reported as financially irresponsible or who had failed to pay their bills for merchandise. There was the understanding among the members in the association that such persons should be accepted as cash customers only. It is not shown that such classification so indicated, as the result of the name appearing upon such a list was necessarily obligatory upon the wholesalers, but the prime purpose of the list was to furnish information to the members regarding the responsibility of patrons, so that loss might be saved on bad accounts. I do not believe that the issuance of these lists, nor the understanding connected therewith, established a violation of the Anti-Trust Law, any more than did the lists referred to in the decision in the case of the Cement Manufacturers' Protective Association v. U. S., hereinbefore referred to.

In that case the court said: "Members of the association render monthly reports of all accounts of customers two months or more overdue, giving the name and address of the delinquent debtor; the amount of the overdue account in ledger balance; accounts in hands of attorneys for collection and any explanation. * * * "

And the court, in holding that the distribution of the reports showed no violation of the law, declared: "The evidence falls far short of establishing any understanding on the basis of which credit was to be extended to customers, or that any co-operation resulted from the distribution of this information, or that there were any consequences from it other than such as would naturally ensue from the exercise of the individual judgment of manufacturers in determining, on the basis of available information, whether to extend credit or to require cash or security from any given customer."

Certainly it would be in the interest of economy in the general business of distribution, both as affecting the dealer and the consumer, that loss suffered through the nonpayment of retailers' accounts, whether due to dishonesty of the creditors or his financial irresponsibility, and which would necessarily become a part of the overhead cost of distribution, should be saved.

The matters in issue, as they affect particularly the wholesalers' association and its members, considered separately from the brokers' association, have received attention in the foregoing. The brokers were not active participants in the affairs of the wholesalers' association, although the evidence shows, and it would appear as an obvious fact, that in general the brokers work in close sympathy and harmony with the wholesalers—this because the field of business of the brokers is naturally and normally limited to supplying the wholesale trade.

[6] As to one branch of the issue made by the government in this case, the evidence requires a finding adverse to both the wholesalers' association and that of the brokers. The trade in grocery commodities, at a time shown by the evidence to be within the period specified in the bill of complaint, was confronted with several retail organizations which are described in the evidence as "chain stores." These organizations were operated separately and severally. They conducted different retail stores and branches, particularly in the city of Los Angeles, with business of such a volume as to give them a commanding position as buyers of grocery commodities in large quantity lots. They demanded of the manufacturers the right to buy direct. In some cases the manufacturer (as he had a legal right to do) declined to vary his practice of distributing his prod-

ucts through brokers and wholesalers. In other cases manufacturers answered the demand by selling direct to the chain stores. The latter practice necessarily affected the business of the broker and wholesaler, and it may not be questioned, I think, but that the evidence sufficiently establishes that the wholesalers and brokers were a unit in their efforts to persuade manufacturers from accepting orders direct from the chain stores. This line of buying and selling direct applied to comparatively few products, ordinarily those which were the subject of nation-wide exploitation by advertising. It may be true, as contended for by the defendants, that the presence of a few large buyers, whose business was to retail commodities, worked no material saving to the consumer when the aggregate of vendible necessities in the particular line is considered, and that, further, the practice of the chain stores to attract business by advertising and selling certain lines at close to nonprofit prices disturbed the system of retail business to the general disadvantage of trade on the whole. Be that as it may, it must be said that any action so taken or conduct pursued, which was intentionally designed to deter a manufacturer or producer from shipping his merchandise to an acceptable customer within the state of California or the Southern District thereof, contravened the prohibitory terms of the law. Latterly, it appeared by the evidence, there has been less complaint because of efforts of the wholesalers and jobbers to preserve intact the line of custom through their agencies, but the condition has existed, and the government is entitled to be assured that, so far as the defendants are concerned, it will be abstained from in the future. Injunctive relief is justified on the ground last stated only.

The wholesalers' and jobbers' organizations, as has been before suggested, are not outlaws formed for the particular purpose of doing acts forbidden by the law prohibiting combinations which interfere with interstate commerce. They may, under their plan of organization and by-laws, serve a useful purpose in the trade; hence the prayer that they be dissolved may not be allowed.

A decree will be entered in accordance with the conclusions expressed in this opinion.

As the result of this decision is favorable in part to the defendants and favorable in part to the government, I think it proper that there should be no recovery of costs, and that each party should bear its own expenses in this suit incurred.