## UNITED STATES v. FIRST NAT. PICTURES, Inc., et al.

District Court, S. D. New York. September 25, 1929.

Charles H. Tuttle, U. S. Atty., of New York City (William D. Mitchell, Atty. Gen., and C. Stanley Thompson and Ralstone R. Irvine, Sp. Ass'ts to Atty. Gen., of counsel), for plaintiff.

Cadwalader, Wickersham & Taft, of New York City (Edwin P. Grosvenor, Arthur L. Fisk, Jr., Gabriel L. Hess, and Charles C. Pettijohn, all of New York City, of counsel), for defendants.

THACHER, District Judge. Throughout the United States there are upwards of 25,000 motion picture theaters, at which motion pictures are exhibited for the entertainment of the public. To these theaters motion picture films—i. e., the positive prints from which the pictures are projected upon the screen—are distributed by the defendants and other distributors, who either produce the films themselves or procure them for distribution from other producers. The process of distribution is highly organized, necessarily so, because each of the exhibitors must be regularly supplied with sufficient films to exhibit throughout the year, constantly changing programs. In order to meet this demand, each of the defendant distributors maintains exchanges in the principal centers of distribution throughout the United States, from which films are delivered to the exhibitors, and to which they are returned after exhibition.

In addition, the defendant distributors, in association with other distributors, are members of local Film Boards of Trade, scattered throughout the United States in 31 principal cities. The exchange managers, representing the defendant distributors in these various localities, are members of the Film Boards of Trade, and other distributors not made defendants herein are also represented upon these boards. The distributors who have been made defendants herein distribute approximately 60 per cent. of all the motion picture films exhibited in the United States. Other members of the Film Boards of Trade distribute approximately 38 per cent. of the films exhibited in the United States, and it is impossible for any exhibitor to secure sufficient motion picture films for its regular operation without dealing with one or more members of the Film Board of Trade in the territory in which its theater is located.

The value for exhibition purposes of a motion picture is highly perishable; that is to say, its first showing will command very much more public interest, and therefore a very much higher rental, than will subsequent exhibitions, and the theaters throughout the country are classified as "first-run" and as subsequent-run houses, depending upon whether the particular theater exhibits first-run pictures or those which have already been shown. Thus, the usual rental in the

first-run theaters in large cities amounts to $1,000, whereas the second-run theaters in the same city will pay $400 to $500, and small theaters throughout the country will subsequently pay for the rentals for the same film as low as $5. For some time it has been the practice of the defendant distributors to announce in the spring of each year programs for distribution during the period of 12 months, commencing in the following fall. Contracts for leasing these films to the exhibitors are made in the spring of the year. The agreements are of license for exhibition in named theaters. They contain provisions fixing the days upon which the films may be exhibited and covenants for the protection of the exhibitor not to license the exhibition of the same films in neighboring theaters during specified periods. The contracts also contain provisions under which, upon any transfer of the exhibitor's interest in the theater, the transferee can, without the consent of the distributor, assume the obligations of the contract, and thereby become entitled to receive the films deliverable under it. The license fees are required to be paid when the films are delivered by the carrier. In contracting for their yearly requirements, the exhibitors usually select from the programs offered by several distributors, arranging exhibition dates so that they may have continuously changing exhibition program throughout the year. If the exhibitor requires additional pictures during the year, he secures these from the exchanges in his territory by "spot-booking" single pictures for exhibition in the immediate future. The delivery of films through the exchanges in performance of the exhibition contracts, and the redelivery thereof to the exchanges, is interstate commerce of a very substantial character. Binderup v. Pathé Exchange, 263 U. S. 291, 44 S. Ct. 96, 68 L. Ed. 308.

It appears that, prior to the adoption of the credit rules which are here under attack, the distributors suffered very substantial losses through the repudiation of their contracts by exhibitors scattered throughout the United States. In the smaller towns, many of the exhibitors were irresponsible financially, and conditions arose very seriously affecting the industry through the transfer of theaters to new owners pending the performance of exhibition contracts. In such cases the new owner, refusing to assume the contracts of the former owner, was solicited by salesmen from various distributors to enter into new contracts, and the distributors whose contracts had been repudiated by the former theater owner suffered serious damage, rarely recoverable. Nor could the films thus thrown back upon the exchanges be readily placed in other theaters, because their programs had been arranged long in advance, and even when this could be done the films had generally become stale, and commanded very much lower rentals than when originally licensed. This situation was seriously aggravated by a common practice among exhibitors in the smaller towns to evade their contractual obligations by colorable transfers of title to their theaters. In such instances the apparent purchaser (in reality, a dummy for the owner) would contract for new pictures, and the old contracts would be repudiated. These abuses were general, and affected all distributors alike. The situation was one which could only be dealt with by joint action of the distributing group, in protection of their interests as a group, and it was to relieve themselves of these conditions that members of the Film Boards of Trade throughout the country organized credit committees and adopted uniform rules and regulations for the establishment and operation of a system designed to eliminate these trade abuses, which in themselves were serious obstructions to the free flow of interstate trade and commerce.

The rules adopted are as follows:

"Rule I. To correct abuses and unfair practices which now prevail in the motion picture industry arising out of changes of ownership of theaters for the purpose of avoiding uncompleted contracts the president with the advice and consent of the members shall appoint a credit committee of three members to serve for a period of three months and thereafter until their successors are appointed to investigate and report to the members the names of all persons who have acquired by purchase or transfer theaters located in the territory within which this Film Board of Trade operates.

"Rule II. The secretary of this Film Board of Trade shall be the secretary of the credit committee and shall perform the duties hereinafter specified and as the credit committee shall from time to time direct.

"Rule III. All sales or transfers of theaters of which members receive knowledge shall be promptly reported to the secretary of the credit committee. Each such reported sale or transfer and such sales or transfers as shall come to the knowledge of the secretary shall be listed by the secretary, and at such intervals as the credit committee shall determine a copy thereof shall be furnished to the members of this Film Board of Trade for their confidential information. Such list shall be designated as a 'Credit Information

List.' Forthwith upon the receipt of each credit information list each member shall deliver to the secretary a statement of each existing contract with such member for the exhibition of pictures at each theater listed. Such statement shall contain (a) the name of the exhibitor with whom each such contract was made and if known the name of the new owner; (b) (1) the number of pictures and (2) the number of playing days contracted for; and (c) if known whether or not the exhibitor provided as a condition of the sale or transfer of his theater for the assumption and complete performance by the new owner of all contracts so listed and if the new owner has agreed to such condition.

"Rule IV. The secretary of the credit committee immediately upon the receipt of a report or learning of the sale or transfer of a theater shall by letter request the new owner of such theater to furnish to the credit committee within five days from the date of such request information and references to enable the credit committee to intelligently report to the members the credit standing of such new owner. For the purpose of securing such information the credit committee shall adopt a form of questionnaire.

"Rule V. The credit committee shall meet at least once in each week to examine and report upon the credit standing of new owners of theaters and shall furnish to the members for their confidential information a copy of such report.

"Rule VI. Upon the refusal or failure of the new owner of a theater to furnish within the time above provided the information and references requested of such new owner credit committee shall indicate such fact upon the credit information list opposite the name of such theater by the words 'Credit information refused' (for which words for brevity the following letters may be used: 'C. I. R.').

"The credit committee shall also indicate on the credit information list every sale or transfer of a theater which upon investigation the credit committee concludes upon information received and considered was made by the previous owner for the purpose of avoiding or being relieved of uncompleted contracts for the exhibition of pictures at such theater. Such conclusion shall be indicated opposite the name of the theater by the words 'Transferred or sold to avoid existing contracts' (for which words for brevity the following letters may be used: 'F. T.').

"The credit committee shall also indicate on the credit information list in a column headed 'Cash Security' opposite the name of each theater listed (excepting, however, such theaters the new owners of which have agreed to assume and complete all existing contracts entered into by the prior owners and of which agreement notice has been given to or received by the credit committee) the amount of cash security not to exceed the sum of One thousand dollars ($1,000) which in the judgment of the credit committee is a reasonable sum which members shall require to be deposited as security for the full and complete performance of each contract thereafter made and entered into for the exhibition of pictures at such theater. The credit committee in determining the amount of such security shall consider the total of the rental of pictures likely to be contracted for and the frequency of the possession by the exhibitor of prints of such pictures.

"Rule VII (Amended). No member of this Film Board of Trade shall enter into a contract or contracts for the exhibition of pictures at any theater listed on the credit information list for a period of ten (10) days from the date of the first appearance of such theater upon such list nor after such period of ten (10) days unless the new owner or lessee of such theater shall have paid in cash to such member with whom such owner or lessee desires to contract for pictures the amount of security specified on the credit information list opposite the name of such theater.

"This rule shall not be deemed to prohibit members from 'spot-booking' pictures for exhibition at any such theater during the said ten-day period, or if the credit committee shall not have then reported upon the credit standing of the new owner or lessee of any such theater to 'spot-book' pictures for exhibition until the credit committee shall have so reported.

"Rule VIII. The credit committee may from time to time upon satisfactory evidence of the credit standing of any new owner of a theater sold or transferred remove from the credit information list the name of the theater owned or operated by such new owner and in such case the members of this Film Board of Trade shall be free to contract with such new owner for the exhibition of pictures at such theater without requiring such new owner to deposit any cash security as a condition for the making of such contract.

"Rule IX. Members shall upon demand of the credit committee furnish any information the credit committee may require to carry out its objects, which shall include the right of the credit committee to examine the books and records of members, but only with respect to any exhibitor who has sold or trans-

ferred his theater and has failed to provide for the assumption by the new owner of existing uncompleted contracts.

"Rule X. Any member of the Film Board of Trade who shall violate any of these rules or regulations with respect to the establishment and operations of a credit committee, or who shall willfully fail to report to the secretary of the credit committee the sale or transfer of any theater of which such member has received knowledge, shall be subject to suspension for a definite period or expulsion from membership. Any such member shall be entitled prior to being suspended or expelled to receive notice in writing of the violation complained of, and such notice shall specify the time and place for a hearing thereon. After such hearing the members of this Film Board of Trade by majority vote shall determine whether or not the charge against such member has been sustained and if sustained whether such member shall be suspended for a definite period (and, if so, fix the period) or expelled."

It is alleged that in operation the exchange managers went beyond these rules and entered into supplemental agreements more drastic in their restraint upon dealings with new theater owners. These allegations are not sustained, but the proof is clear that financial and moral responsibility were subordinate considerations, and the purpose in requiring deposits on new contracts with old theaters was to induce the new owner to assume and perform the old contracts. In operation, the rules have generally been employed as a basis for negotiation with a view to fair adjustment of the interests of all concerned, and the results have been beneficial to the industry. No exhibitor has complained, and no injury is shown either to individuals or to the general public.

In justification of this combination and agreement between the defendants and other distributors, United States v. Fur Dressers' & Fur Dyers' Ass'n, Inc., et al. (D. C.) 5 F. (2d) 869, is cited as a decision of this court precisely in point. In that case fur dressers and dyers formed a credit association and agreed among themselves to render services only for cash to fur merchants who were delinquent in the payment of their debts. Bondy, J., held that such a combination was not an unlawful restraint of trade. In the instant case, however, the real purpose of the defendants was not to obtain security for the payment of rentals or other claims which might arise under their contracts, but their purpose was, by requiring security for the performance of new contracts, to induce the theater owner to go on with the old contracts, for the performance of which no security was required. The combination of which the government complains in this suit therefore differs substantially from the combination considered by Judge Bondy, and it becomes necessary to determine whether by reason of its purpose or effect it is to be condemned as an unlawful restraint of trade, under the provisions of the Sherman Anti-Trust Act.

■ Combinations and agreements designed to promote fair and honorable dealing, and to correct fraudulent and irregular trade practices in themselves obstructive of trade, are not unlawful, if in purpose and effect they do not suppress competition, but merely regulate competition, and thus promote the free flow of commerce. Chicago Board of Trade v. United States, 246 U. S. 231, 38 S. Ct. 242, 62 L. Ed. 683; Standard Fashion Co. v. Magrane-Houston Co., 258 U. S. 346, 355, 42 S. Ct. 360, 66 L. Ed. 653. In Cement Mfrs.' Ass'n v. United States, 268 U. S. 588, 604, 45 S. Ct. 586, 591, 592, 69 L. Ed. 1104, the court, in its opinion, called attention to the fact that it had in Swift & Co. v. United States, 196 U. S. 375, 395, 25 S. Ct. 276, 49 L. Ed. 518, approved a decree which provided that defendants should not be restrained "from establishing and maintaining rules for the giving of credit to dealers, where such rules in good faith are calculated solely to protect the defendants against dishonest or irresponsible dealers."

■ In the instant case all the badges of unreasonable restraint are lacking. There is no suppression of competition, nor any attempt to monopolize. No one has complained, except the government. No injury to individual traders or to the public generally is disclosed. On the contrary, serious trade abuses have been eliminated, and both exhibitors and distributors have been benefited. Fraudulent transfers, designed to avoid the performance of contracts involving interstate commerce, have been discouraged. Exhibitors have been dissuaded from overbooking, a practice not infrequently indulged in to exclude the competition of new theaters. Reasonable arrangements have been encouraged, under which persons acquiring theaters for which films have been booked long in advance have assumed the performance of existing contracts, thus avoiding serious interruption of interstate trade, inherent in the old abuses. There is no evidence of oppression, no intent to drive out or exclude any one from the business of exhibiting motion pictures.

The most serious complaint is that deposits in small amounts have been required from

bona fide purchasers of motion picture theaters as security for the performance of new contracts, and this requirement, insisted upon only if the new owner wished to make new contracts without assuming the old, has been employed to induce the new owner to assume and carry out the uncompleted contracts of the former owner. The evidence abundantly discloses that in such cases the credit committees endeavored to make fair adjustments, realizing that it was in the interest of the distributors, as well as of the exhibitor, that this be done, so that responsible and successful theaters might be established. The repudiation of pending contracts by a theater owner almost always involved the interests of several distributors. These interests were substantial. During the year 1927 the aggregate rentals involved in uncompleted contracts of theaters transferred to new owners was $7,297,374.15, and in 1928 the sum was $9,843,970.23. It was natural and normal, therefore, that agencies representing all of the distributors should be employed to deal with such cases, in an effort to arrive at an adjustment which should be fair and reasonable to all concerned.

In most cases the former owner, who had repudiated his contracts, was financially irresponsible, and the obvious business task involved was to persuade the new owner, who was continuing the same business, to make a fair adjustment of the old contracts. The cooperation of creditors to this end was not illegal, and the agreement of the distributors for the protection of their common interest to refrain from making new contracts without some security, until fair and reasonable adjustments should be made, was not unreasonable in its restraint either upon the distributors or the exhibitors. The effect of what was done was that the new owner, upon making a small deposit of security, was free to contract for the delivery of any films with any distributor. No security was required of him on "spot-booking" contracts. He was free to take delivery under the contracts of the prior owner of any films without giving any security. Distributors, it appears from the evidence, were always willing to meet the exhibitor's business necessities to scale down the contract requirements, and, if desired, to substitute other pictures for those contracted for. And the credit committee undertook to make such adjustments in behalf of all the distributors involved. It was only in rare instances, usually either in cases where colourable transfers of title had been fraudulently made to escape the owner's contracts, or in cases where the new owner preferred to comply with the demands for security, that such situations were not soon adjusted to the satisfaction of all concerned and the posting of security waived.

It should be remembered that, when a theater owner who has contracted to exhibit films in his theaters disables himself from performing his contractual obligations by conveying his theater to another, his deliberate breach of contract is apparent. The purchaser, who must be assumed to have knowledge of the business upon which he is about to embark, almost certainly knows that any going theater has such contracts outstanding, and that the conveyance of the theater without any assumption of these obligations will necessarily result in their breach. If it be said that such a purchaser is under no legal obligation to assume the improvident contracts of his predecessor in title, it may be answered that the willingness of men to deal with one another is properly influenced by an expectation of fair dealing without insistence upon the pound of flesh, and that one not disposed to attempt to reach fair adjustments cannot fairly demand from those who are injured new contracts without some security. The defendants' agreement to demand security was fully justified by their common interest in preserving the integrity of contractual obligations owing to them by others. Such restraints as may have resulted from what was done were incidental to this legitimate purpose, and therefore not unreasonable or unlawful.

This opinion may well be concluded, as was a recent opinion of the Supreme Court of the United States, with the statement: "To extend a statute intended to reach and suppress real interferences with the free flow of commerce among the states to a situation so equivocal and so lacking in substance would be to cast doubt upon the serious purpose with which it was framed." Industrial Ass'n v. United States, 268 U. S. 64, 84, 45 S. Ct. 403, 408, 69 L. Ed. 849.