**BOGGUS MOTOR CO. v. ONDERDONK et al.**

No. 269.

District Court, S. D. Texas, Brownsville Division.

Feb. 9, 1935.

Galbraith & Goodrich, H. B. Galbraith, R. B. Creager, and C. K. Richards, all of Brownsville, Tex., for plaintiff.

Douglas W. McGregor, U. S. Atty., of Houston, Tex., Carlos G. Watson, Asst. U. S. Atty., of Brownsville, Tex., and William L. Pencke, Sp. Atty. for National Industrial Recovery Administration, of Dallas, Tex., for defendants.

KENNERLY, District Judge.

Plaintiff, Boggus Motor Company, a Texas corporation, and a motor retail dealer at Harlingen, in this district and division, filed its original bill in equity herein September 10, 1934, against L. H. Onderdonk and Z. E. Avery, field adjusters of the National Recovery Administration of the National Industrial Recovery Act § 1 et seq. (15 USCA § 701 et seq.), who it was alleged were to be found in this district and division, to enjoin and restrain them from enforcing against it certain provisions of such act (referred to for brevity as the N. I. R. Act), and of the Code of Fair Competition for the Motor Retailing Trade, approved by the President thereunder, both of which plaintiff attacks as constitutionally invalid.

November 19, 1934, plaintiff filed amended bill, making Douglas W. McGregor, the United States District Attorney of this district, a party defendant. In its amended bill, plaintiff alleges:

(a) That defendants Onderdonk and Avery have accused plaintiff of violations of such act and code, are threatening to enforce, and attempting to enforce, against it the provisions of such act and such code, particularly those provisions which relate to wages and hours of labor of employees, are demanding access to its books and papers, are interviewing and creating unrest and dissatisfaction among its employees, are demanding from it various sums of money, are threatening plaintiff with criminal prosecution, are threatening plaintiff with injunction and other proceedings closing plaintiff's business, and which would injure and destroy plaintiff's business. Also are threatening plaintiff with social ostracism and business boycotts by the public, and are generally interfering with plaintiff and its business. Alleging that both such act and such code are invalid under the Federal Constitution, plaintiff's prayer is that they (Onderdonk and Avery) be perpetually enjoined and restrained from so doing.

(b) Plaintiff says with respect to the defendant McGregor (referred to for conven-

ience as District Attorney): "That as has been heretofore alleged as shown by the course of conduct of the Defendants Avery and Onderdonk before, at and after controversy with Plaintiff, and as is shown by the exhibits attached hereto, the National Recovery Administration intends to prosecute and openly threatens to press 'extreme measures' against all who do not conform to their so-called Code, or who prove stubborn or recalcitrant in meeting their money demands for 'equitable contributions', fines, penalties, or 'restitution', and since under the law by virtue of which they purport to act, it is made the duty of the United States District Attorney to prosecute, civilly or criminally, complaints properly lodged and filed with his department, and the presumption being that your Honor's District Attorney, the Honorable Douglas W. McGregor will so prosecute complaints threatened to be filed with him by the National Control Committee and the State Advisory Committee of Texas, he is the necessary and proper party to this action, and unless and until he is enjoined from prosecuting complaints under the NIRA the intimidation, annoyance, expense and danger to your Plaintiff are continuous and its damage, as before alleged, is irreparable."

It prays for perpetual injunction against the District Attorney.

In its amended bill, plaintiff seeks to recover no damages for past injuries, the sole relief asked being injunctive.

In its amended bill, plaintiff seeks also to invoke section 400 of title 28 USCA, relating to declaratory judgments, attacks the National Industrial Recovery Act and such code, and prays that they be declared constitutionally invalid, and that the rights of plaintiff and defendants thereunder be declared.

Defendants have moved to dismiss, and without waiving their motion, have answered. The motion to dismiss has been denied, and the case heard on the merits, the questions of law raised by such motion being preserved to the parties upon the trial. Dixon v. Hopkins (C. C. A.) 56 F.(2d) 783.

The material facts fairly deducible from the evidence are as follows:

(a) Plaintiff is a corporation organized under the laws of Texas, with its domicile at, and doing business at, Harlingen, in this district and division.

(b) Its business is the buying and selling of new and used automobiles, and the repairing of automobiles in intrastate commerce, and in no way or manner in either interstate or foreign commerce.

(c) October 3, 1933, the President, in compliance with the provisions of the National Industrial Recovery Act, by Executive Order, approved a Code of Fair Competition for the Motor Retailing Trade (for brevity referred to as the code). Thereafter, on April 20, 1934, July 14, 1934, October 19, 1934, and December 8, 1934, amendments thereto were made (presumably with authority) by different administrative officers.

(d) May 7, 1934, plaintiff, in writing, acting by its president, J. L. Boggus, assented to the code in the following language:

"Certificate of Assent to the Code of the Motor Vehicle Retailing Trade.

"In consideration of signature by other members of this Motor Vehicle Retailing Trade to similar applications or certificates I (we) apply for Code Insignia for said Motor Vehicle Retailing Trade and I (we) am (are) complying with the Code of Fair Competition for said Motor Vehicle Retailing Trade and agree with the President of the United States to comply with said Code and to pay my (our) fair share of the expenses for administration of said Code. I (we) recognize that the Code Insignia is the property of the Government and subject to recall by the Administrator in case of violation of said Code and/or non-payment of my (our) fair share of the expenses of the administration thereof."

(e) Harlingen is located in Cameron county, in an area usually referred to as the valley. Located in the valley, there were and are approximately fifty or sixty motor retail dealers, some of whom did, and some did not, assent to the Code. Many and various meetings were held by these dealers, many and perhaps most of which were attended by J. L. Boggus, president of plaintiff (for brevity referred to as Boggus). These meetings, or some of them, were also attended from time to time by defendants Onderdonk and Avery, known and referred to as field adjusters or adjusters, or some similar term, under such National Recovery Administration, whose business it was, or who made it their business, to induce dealers to assent to the code, instructed them in the operations of the code, and announced their purpose to enforce the code. Many inducements were offered and representations made to the dealers by these ad-

justers and others connected with, or purporting to be connected with, such administration. Boggus himself was a member of the "Local Advisory Committee," and was active for a time along all these lines, and earnestly, and rather strenuously, insisted to these adjusters and others (and to the "State Advisory Committee," in at least one letter) upon the vigorous enforcement of the code, particularly with respect to price fixing. The evidence, however, shows that the whole situation remained in a state of more or less confusion in so far as the motor retail dealers in the valley were concerned. Some did not assent to the code, some of those who assented to the code wholly or in part complied with it, and some did not, and there was much discussion, many reports, and general talk and threats of enforcement, but no enforcement.

(f) About the time it became apparent that such code would not, or could not, be enforced in the valley, defendants Onderdonk and Avery and others accused plaintiff and Boggus, its president, with unfair practices under the code in connection with the wages and/or hours of labor of one or more of plaintiff's employees. This, plaintiff and Boggus strenuously denied. The evidence shows that neither plaintiff nor Boggus were guilty. The controversy became heated between them, and extended over a period of some days, and up to approximately September 10, 1934, the time of the filing of plaintiff's original bill. During the time, Onderdonk and/or Avery charged plaintiff and Boggus with violations of the laws of the United States, and of the code, threatened them with criminal prosecution, threatened to enjoin them from doing business, and threatened by injunction or other court action to close plaintiff's place of business. They demanded that they be allowed to inspect plaintiff's books, interviewed plaintiff's employees, creating dissatisfaction among them, etc. Quotations in the note[1]

---

[1] "Q. Now, briefly, at this meeting at Weslaco, Mr. Boggus, what had the retail dealers here in the Valley done or attempted to do? A. Well, I will have to elaborate on that a little bit. We started in to try to follow this code. Mr. Boyd came down and explained it to us two or three times. We were promised enforcement as far as the fair practices were concerned. We labored under the belief that we would get this enforcement; continued—most of us, most dealers—continued to follow the fair practice part of the code. We organized an organization down here in the Valley which was according to a letter we got given the sanction of the State Advisory Committee, which comes on down from the National Advisory Committee, and this Board, the local Advisory Committee, of which I was a member, was supposed to take complaints and handle these complaints and pass them on up, and in cases of violations, we would get some action or something would be done whereby violators would be brought under the code and we would not lose business to competitors who were entitled and were kind of inclined to violate the fair trade provisions of this code. We worked on that several months and several promises of Mr. Boyd, 'We have just changed this' or 'We just got official sanction for this' or 'We just got this' or 'That,' and Mr. Onderdonk had in the meantime come down to Harlingen to enforce something and our secretary, Mr. March, in Harlingen got in touch with Mr. Onderdonk after he had filed several complaints of one kind or another, got no action, and wanted to know if in his official capacity if he could help us enforce the code of fair practice of the automobile industry. He came down and assured me in no uncertain terms that he could—Mr. March and myself, that he could enforce the code. We had a meeting with Mr. Onderdonk, our dealers had, at which Mr. Onderdonk was present. Mr. Onderdonk assured us that in his official capacity he could go in and get information and that he could investigate, get information, that he could get action, he could get the thing pushed for us through the district attorney's office or otherwise. We turned over to Mr. Onderdonk several complaints. We got no action on these complaints. So finally just before, previous to this meeting, I asked Mr. Onderdonk just how long a fellow is going to have to tolerate some of the practices of some of the dealers and how long he is going to have to lose business, and how much it was going to cost me in particular to wait for action for some definite decision on this code. He evaded the question as long as he could and then he showed me a letter from Mr. Johnson or it purported to be from Mr. Johnson or his office—

"Q. You are referring now to General Hugh S. Johnson? A. I am referring now to General Hugh S. Johnson, the head of the NRA at that time. This letter that he read in part there to me was to the effect that he was to deal with labor and wages and to stay away from the fair practice part of the code, that is, the price fixing part of the code. 'Well,' I said 'now we

from Boggus' testimony quite clearly and in detail show their action.

(g) Almost immediately after the filing of plaintiff's original bill (September 10, 1934), Onderdonk and Avery were withdrawn from the valley and sent to another part of the country, and have since not been in the valley and have in no manner interfered with plaintiff, nor have they threatened to do so. The threats previously made were not carried out. Because they were not, plaintiff suffered no actual damages. At any rate, the evidence shows no actual loss or damage. Had the threats been car-

have appealed to you; we have sent numerous complaints here, there and yonder and you are the last word in this thing and you now tell me that there is not much that you can do about the fair practice part of this code,' and he said, 'Well, my hands are just tied at present.' I said, 'If your hands are tied at present on that part, they are tied as far as labor is concerned as far as I am concerned.' We talked it over with some of the other dealers and they were all of the same mind, that if we could not get enforcement as far as fair practices were concerned, that we would appeal to some source to let us out of the code. And we had this meeting in Weslaco and we made up a petition which practically every dealer, I think thirty-seven out of thirty-nine signed the petition. First, we sent it to everybody we thought had any authority, or proposed to have any there in the NRA, asking them for a definite stand but as far as we were concerned to be let loose from the wages and hours due to the fact that we could not get compliance on the others. We filed this petition with three or four NRA enforcement bodies. And then right after that petition—do you want me to continue within this now?

"Q. Surely. A. All right. We filed this petition and Mr. Onderdonk came into—Mr. Onderdonk wasn't invited to this meeting because we wanted to discuss it freely and we did discuss it freely, and everybody there agreed that was the thing to do, that we weren't getting anywhere with the code, that it was hurting us on one side—hurting us on both sides at that time. I don't know whether the other dealers did or not, but as far as I was concerned I didn't feel like going on with the automobile allowance part unless we could force the other dealers to, so we got this petition up. This petition was laying on Mr. March's desk in Harlingen. He was out some time. Mr. Onderdonk came in there to discuss some matter with Mr. March. He saw this petition and asked Mr. March where he got it. He said he got it from me to make some copies. Mr. Onderdonk assumed, I guess, that I—

"Q. Don't guess. A. All right, okeh. Mr. Onderdonk came over to my office then. He wanted to know what the idea of that petition was and who wrote it.

I told him I had about as much to do with it as any one and he was very much provoked at the fact that we had written this, told us that it was absolutely useless to send it in and would just cause nothing but trouble for us dealers. And I told him 'Well,' I said 'that is just our idea and that is the reason we didn't have you there last night; we didn't think you would agree with us; that is just our mind, that we are trying to get release by that method.' So he was gone a little while and he came back about eleven o'clock. He told me that he had two complaints against me. I had let two men go on the Saturday night before. He told me he had two labor complaints against my organization and I told him 'All right.' We sat down and he figured out there what—he had these complaints written down; he figured out the number of hours—had some one figure—they had a little overtime and he figured out what I would owe them, sixty some odd dollars. He asked me for the money. I told him I wouldn't give it to him. He rose very highly insulted and told me that I would—that I had been wanting action on the code. He said 'You are going to get it within twenty-four hours.' I said, 'That is just exactly what I want' and he left. About five o'clock he came back and he was in a little bit better humor. In fact, he asked me to have a cup of coffee. I just had some and didn't drink it. So he sat down and said 'Let's don't have any argument over this thing. You are too nice a fellow to deal with and you are one of the fellows that tried to uphold this code in the Valley. Let's don't us go to bat on this code proposition. Let's figure out this proposition. The boys made four hours a week overtime and pay them sixteen dollars and something.' That is what he asked me for. I said 'No, Mr. Onderdonk, I don't owe those boys anything. You are assuming that their statement is correct. You are taking a lot of things for granted. I don't owe those boys a thing in the world and I don't propose to pay them anything' and he went off. He said, 'Well, you think it over; take a day or two and think it over. You know you don't want any trouble and I don't want any trouble, and we don't want to start from this angle with this code.' So he went off and about two

ried out, plaintiff would have suffered large damages and much in excess of $3,000. Particularly is this true if plaintiff's business had been closed by injunction or otherwise, as threatened by Onderdonk and Avery, and if plaintiff's contract as a Ford sales agency had been endangered (as plaintiff claims it would have been) by the closing of its business.

(h) Since the filing of plaintiff's original bill, and the departure of defendants Onderdonk and Avery from the valley, plaintiff has received, through the United States mail, certain letters, circular letters,

days later came back and this was on a Tuesday—no, Monday—no, Tuesday. About Wednesday he came back and he had a nice talk with me and he hadn't been able to see those boys any more, but he said, 'Let's have a meeting with those boys in my office and you come down and talk to them yourself.' He said 'You probably don't owe them anything. I don't believe they will face you with the complaint. You talk to them yourself and maybe they will withdraw their complaint.' I said, 'I don't want to talk to them. They are helpers back in the shop. I don't want to get in an argument with them. They are out of my employ and they are paid and there will be no discussion about it with them or anybody else unless you come in here and talk to me.' He said, 'Well, I will talk to them and they will probably see the light and probably won't press this complaint regarding this overtime.' Well, I didn't hear any more from Mr. Onderdonk until Saturday. Saturday morning Mr. Onderdonk came rushing down and he left word at my office for me to come down there right quick. Saturday is a pretty busy day at our office. I went down to Mr. Onderdonk's office. He had four men in his office, and I knocked and as I did I said Saturday was a pretty busy day, I would like to see him Monday. He said, 'You better stay here right now; you are in serious trouble. If you don't get this thing fixed up right now, you are going to be made Exhibit A as far as this code thing is concerned.' I said, 'What is the matter'; he said, 'We have a man from Washington will be here Monday.' I said, 'I don't care if it is Hugh Johnson I am not making any concession on account of that.' He had me repeat the part that I didn't care if it was Hugh Johnson for the benefit of those men that were there, I think. He said, 'You better' and I said, 'I am going back to my business; I am busy.' I didn't see anything more until Monday morning. Monday morning I had Mr. Onderdonk and Mr. Avery and three other men, I have forgotten their names, Mr. Blank was one, some other fellow from St. Louis and some other fellow from Washington; they called on me and Mr. Avery acted as spokesman, told me how serious I was getting into trouble and I was more or less inclined to dis-

agree with them so Mr. Avery asked to speak to me privately, called me off in a side place over there to explain to me the seriousness that I was in, said that from a friendly standpoint he would like to settle this thing right quick that morning. He said, 'I would just rather not go another thirty minutes.' He said, 'As far as taking the stand you are taking is concerned we would actually appreciate it if you would continue with this stand because nothing would help compliance any more than to have a test case right quick on this code.' I said, 'Mr. Avery, you have got it. You have got a test case if that is what you are looking for and you consider me a violator; you have a test case. Go after it.' He talked to me quite a while and he said, 'I want to give you to five o'clock to think this over. This is more serious than you think.' All this time I think he is a big shot from Washington. I said, 'All right, Mr. Avery, I will think it over until five o'clock, if you want me to but my decision, I think, will be the same.' So at about five o'clock he came back with Mr. Onderdonk only, if I remember, and asked me what my decision was. I told him that my decision was still the same, that I wasn't making any concessions on paying these boys or anybody else anything. Well, he wanted to know, he said 'Is that final? Are you actually going to take that stand?' 'I am taking it, telling you again for about the hundredth time.' So they went away and I think the next day came to Brownsville, anyway, they left my place. The next night Mr. Blank, who was with them in the first meeting, called on me and he had been—he is with the Fort Worth office and he had been down here before. He had been down here assisting or attempting to assist with the enforcement plans of this code. Just what his official capacity was, I don't know, but he was with the code and introduced as one of the officials of this group. Mr. Blank called on me and knowing me better than the others, and having been in to see me several times and attempting to work with me in the compliance part of the code before, before we had called in Onderdonk, he talked to me very confidentially and give me quite a lot of advice from a friendly personal standpoint, from just one man to another. He tells me he had been—He

pamphlets, etc., from persons not parties to this suit, and whose authority under the N. I. R. Act and such code is not shown, containing instructions, directions, exhortations, warnings, requests, and/or demands for small payments of money (apparently claimed to be owing by plaintiff by reason of plaintiff's assent to the code), but having no reference to, or connection with, the Onderdonk and Avery incident.

There is no evidence here, however, that either Onderdonk or Avery, or any person holding the same or a similar position to that held by them, or any one in authority over

told me he had been a used car dealer in San Antonio, and he felt a certain sympathy towards the automobile dealer and so forth, and that I was taking the wrong attitude and he advised me—he also proposed to be a lawyer; he told me he had been a lawyer, that he had been admitted to the Bar. He advised me that I was absolutely taking the wrong stand and he said, 'I am afraid you are laboring under the wrong impression because of the setup of it in the Valley regarding the trying of these cases.' He advised me that this case would be tried under a Judge, that it could be and probably would be tried under a Judge who was favorable, and there were several of them. He went into details to outline to me how Judges over the country had been switched around, given three months vacation, put on pensions and so forth to put a man on the bench who would handle these things properly. I told him I didn't understand anything about Judges.

"Q. (by Mr. Galbraith) Did he make any reference to the Supreme Court, Mr. Boggus? A. I want to get to that. Not at this meeting. So Mr. Blank went on in detail on that and he said, 'You are going to get into a proposition here where you can't win; you can't win at all; it is just a question of a few days. Probably by signing a compliance agreement, you can get away from that.' I said, 'It is a matter of principle. We start out on the proposition the government tells us they are going to pay list for automobiles to begin with and they discharge on one side and the Post Office gives it to other dealers for less than my price and there is nothing proposed to be enforced about this cockeyed thing except the wages and hours that every one owes, and it is just a matter that I am out from under.' So he went off in a friendly mood himself. The next night they came in again. The next day he went away—came up to my place with Mr. Avery and had a friendly little chat. Mr. Avery and Mr. Blank went off together. The next night Mr. Avery came up just as I was closing up. I was fixing to get in my car; I believe he had his wife with him; he had a Ford automobile; and he said he just wanted to have a friendly visit with me and he came in and we went over the same thing we went over with Blank. He referred to the proposition of Judges and the Supreme Court of whom there was six members of the Supreme Court would absolutely uphold the New Deal features. I said, 'You are dealing with things I don't know anything about. I never saw a Federal Judge in my life except Judge West, and I wouldn't know how to ask a special favor and I wouldn't know how to get one. I am simply going into a thing here that I think any Judge or anybody is going to see this thing where there has got to be a fair deal or some deal for the dealer.' He said, 'Well, it is going to be worked out. You are going to get compliance on this automobile part. You are jumping at conclusions. While we are working on it a year' he said 'well, just before we get to the corner you are jumping to conclusions too quick. You dealers down here in the Valley are a fine bunch of fellows, but you just jump over the traces a little too quick for your own benefit. What we are trying to do is to keep you out of the fire until we can show you what we can do.' I told him about my conversation with Mr. Onderdonk where he didn't have anything to do with fair trade practices any more, and where he read it in the paper, and he said, 'You are doing the wrong thing to get this in Court because they will railroad it through; you aren't going to get by with it. They will get it through whether you like it or not.' I said, 'All right, I have already taken my stand. There is no use you coming back to me or them coming back; I have taken this stand for two weeks.' Then he went away. The next night Avery and Blank come in together and we had another long discussion with the final result that they wanted me to sign a compliance—I believe Onderdonk was present this time, I don't remember, but anyway Avery and Blank came into the office, had a compliance—some little slip there to read, and I wouldn't agree— compliance agreement, that is what he had there if I remember right. He said he believed he could get this thing straightened out if I would sign a compliance agreement, he said, on this code a hundred per cent. I said, 'Mr. Avery, I am not going to sign anything about it whatsoever.' In the meantime, this second conversation when he came in for this friendly chat, he broke down and told me he was a school teacher, I believe,

them, or any one connected with the administration of the N. I. R. Act, have in any way interfered with, or threatened to interfere with, plaintiff since the departure of Onderdonk and Avery. The facts show the whole movement against plaintiff begun by Onderdonk and Avery has collapsed and been wholly abandoned.

It is a fair inference from the evidence that since the filing of its original bill, and the departure of Onderdonk and Avery, plaintiff has in no manner violated the provisions of the code.

(i) The United States District Attorney for the Southern District of Texas, made a party hereto by plaintiff, has made no threats

from Orange, Texas. It relieved me quite a bit to know that I wasn't dealing with a high official from Washington. He told me how long he had been on this job and so forth.

"Q. Was that Mr. Avery or Blank? A. That was Mr. Avery. I found out that night that Mr. Avery was not from Washington. That is the first time I found it out. So we went on and we almost got up a close—in fact, we did have some acquaintances in common and had a nice discussion about those friends; so the second night, the night he came in with Blank, he had this compliance agreement made up for me to sign, asked me to sign this and that this could be straightened out by my signing this compliance agreement and staying on it a hundred per cent. I wouldn't sign this compliance agreement. Mr. Avery then left. I believe that was Friday night. He left. He told me he was going back to Houston and he told me he hadn't written in a report to the office yet, and that he would like for me to come into Houston and talk to Dr. Elliott, I believe he called him. He told me Mr. Elliott was a fine fellow, if I would come in and talk to Mr. Elliott, he was sure Mr. Elliott would show me the law on this NRA from every phase. I told him I didn't have anything to talk with Mr. Elliott about. I didn't know when I would be in Houston. So I believe it was Saturday—I don't remember whether I got a long letter or telegram; I believe it was a long letter from Mr. Elliott telling me that he was going to San Antonio to discuss—I can produce that letter—to discuss my case together with other cases with, I believe he said, a Mr. Drout, if I remember right. He gave me the address to wire him by two o'clock, I believe that was the following Monday, the date he was going to be there, to avoid immediate prosecution; that if I didn't have the wire there he would immediately prosecute. I didn't answer this wire. Mr. Avery then didn't show up. Mr. Avery was out of town. He was back up in Houston giving this report presumably to Mr. Elliott. Mr. Onderdonk comes in about Tuesday and tells me how he has his hands tied on the enforcement of the fair practice part of this code. He says, 'You have upheld the fair practice part of this code and

other dealers, some of them, haven't. We have several complaints and we are just fixing to get our compliance through Mr. Blank and his office because that is the logical source to get it from, and if you will just untie my hands so I will get in and help Mr. Blank and we will get the information necessary and we will work on these fellows that have been violating the fair practice.' He named Mr. Knapp as a serious violator and he said, 'That is the man we want to get.' I, myself, had made no complaint against Mr. Knapp, and I told Mr. Onderdonk that I wasn't trying to get Mr. Knapp or anybody else. I was trying to get relief. I wasn't trying to deal with anybody as a personality. He appealed to me there for about two hours. He finally told me if I would sign a compliance agreement that he was sure that he could get these boys to withdraw their complaint and that he could get me an additional—if forty-four hours was too little time for working mechanics and others, he could get me an increase weekly allowance—hour allowance and he told me he had done such things.

"Q. (by Mr. Galbraith) Did he mention the hours? A. He mentioned fifty-six.

"Q. Sir? A. He mentioned fifty-six. He said, 'What if I could get you a permit to operate fifty-six hours a week, to work your men fifty-six hours?' I told Mr. Onderdonk, I said, 'That wouldn't be fair to the other fellows if you are going to give me a permit to work longer or get it through for me.'

"Q. Possibly Judge Kennerly doesn't follow you, Mr. Boggus. Your code provided for how many hours? A. Forty-four hours a week.

"Q. You couldn't work a man more than forty-four hours a week? A. No, sir, not ordinary labor.

"Q. And Mr. Onderdonk was promising you an exemption of fifty-six? A. Yes, sir, he promised to get me that.

"Q. And did he say anything about others he had gotten it for? A. Yes, sir, he told me he had gotten it for other people.

"Q. Did he say where? A. No sir, he did not; and I disagreed with him again. I told him 'that wouldn't be fair to the other fellow and I am not going to sign anything. If you want to get that and present it to me why, I might work under

that he will take action of any kind against plaintiff, nor has he done anything indicating a purpose to do so. There is no evidence showing, or tending to show, that any request has been made of him by the administration of the N. I. R. Act, or by the Attorney General, or any other person, to institute or prosecute either criminal or civil

it, but I am not going to put my name on anything here that you are going to have me tied with,' so he went ahead and elaborated on how I had his hands tied on the enforcement on this thing and that I might cost him his job, the way it looked, that this thing was mixed up pretty bad, and when I refused to do that, he left and that was the last time, I believe, that he officially called on me.

"Q. Now, I wish you would tell his Honor whether or not these men did anything in the way of demands on your books, papers, interrogation of your employees and so forth, Mr. Boggus? A. Oh, yes, they wanted to see my books; they wanted to see my books regarding—

"Q. By 'they' you mean who? A. Mr. Onderdonk and Mr. Avery were the ones that did the talking; they were the spokesmen—let me go back a minute also. They asked me for my books and I refused to give them my books. I told them I would be glad to give them a schedule of my payroll for as long as they wanted. They asked for ninety days and I gave it to them. They told me that looked pretty good, particularly where my average pay to mechanics was double what the NRA required and they said 'There is no reason why this thing cannot be ironed out easily.' The first morning, though, when they came in together, unknown to me, Mr. Avery called me off into my little office over there, wanted to know if I wouldn't talk to him privately. I went over and talked to him about thirty minutes to an hour. In the meantime Mr. Onderdonk went back and tried to get different information out of the people in the shop, went back and talked to the washing rack man and a salesman and so forth. I didn't know that until the next day. I had been so busy. I found out he had gone back to the two men back in the shop and a salesman and so forth, and asked the bookkeeper for certain information and the bookkeeper, in the adjoining office, had heard me tell them I would give them my payroll showing every man and the hours he had worked, the length of time he had been with us, the time he worked and the pay he got for each week in our employ and he gave him that for ninety days—what he asked for; I think he asked for ninety days and I think that is what he got.

"Q. Now, did they interrogate any of your employees? A. Yes, sir, they did.

"Q. Other than those you have mentioned? A. They talked to one mechanic in particular, talked to my body man, talked to two salesmen, talked to—I believe they talked to the man on the wash rack, I am pretty sure they did—yes, I am sure they did.

"Q. Now, what threats or prosecution or injunction were leveled against you, Mr. Boggus, at that time? A. Well,—let me see, the first morning they told me the possible things that could happen.

"Q. Well, what were those? A. That I could be closed up within twenty-four hours and, frankly, I expected them to attempt that. You remember I came down and made arrangements whereby they couldn't. They told me that could be possible. They could prosecute me criminally and a number of things that they told me could have happened to me that would have wiped me out overnight, including the injunctions and fines and prosecutions, but the main one was, though, that they could get an injunction and force me to comply with it and they could get that almost immediately.

"Q. Now, I will ask you to tell his Honor what would be the effect on your business of even a temporary closing under injunction. A. Well, it might as well be permanently closed almost.

"Q. Well, Judge Kennerly does not understand the business as well as you do, Mr. Boggus, and for the record, what would be the effect of even a temporary closing on your business? A. Well, a temporary closing of my business due to the fact that I carry quite a number of accounts, quite a few notes, used cars and so forth, a business closed is just like a closed bank, people quit paying. A temporary closing for any length of time would reduce my assets to just about the physical assets in my shelves, more or less, and would probably lose me my franchise with my company which I deal with, in fact, I am sure it would. Any closing for any definite length—I believe, say, thirty days would cost a man a franchise. I don't think they would tolerate a man closing that long. Of course, a day I don't think would hurt so much.

"Q. Now, assuming you were closed by temporary injunction and would have to sell your stuff for its value on the shelves what would be the salvage recovery you could expect from your business? You testified it was worth from fifteen to twenty thousand dollars of a going concern."

proceedings against plaintiff in connection with the accusations brought against plaintiff by Onderdonk or Avery, or otherwise.

■ 1. The jurisdiction is under subdivision 1 of section 41, title 28 USCA, in that plaintiff's case arises under the Constitution and laws of the United States, and the matter in controversy exceeds, exclusive of interest and costs, the sum or value of $3,000. Plaintiff is in good faith seeking by injunction to prevent an injury to, or the destruction of, its business, of value more than $3,000. In Local No. 7 v. Bowen, 278 F. 271, 273, this court uses this language: "Further, it is the settled rule that the amount in controversy in injunction suits is not the sum which the plaintiff might recover in a suit for the damage already sustained, but the amount or value of the right which the complainant seeks to protect from invasion, or of the object to be gained by the bill. Board of Trade of City of Chicago v. Cella Commission Co., 145 F. 29, 76 C. C. A. 28; N., C. & St. L. Ry. v. McConnell (C. C.) 82 F. 65; 11 Cyc. 878; Railway v. Kuteman, 54 F. 552, 4 C. C. A. 503." See, also, the line of cases represented by Hunt v. Cotton Exchange, 205 U. S. 324, 27 S. Ct. 529, 51 L. Ed. 822; Glenwood Light Co. v. Mutual Light Co., 239 U. S. 122, 36 S. Ct. 30, 60 L. Ed. 175.

■ 2. It is pressed upon me that the National Industrial Recovery Act and such code are constitutionally invalid, and that for that reason, relief by injunction should be given plaintiff against defendants. Assuming, but not deciding, that they are invalid, plaintiff is not entitled to relief in equity against defendants, except upon a showing of some clear ground of equitable jurisdiction. Yarnell v. Packing Co. (C. C. A. 5) 70 F.(2d) 435, 437, 439, 92 A. L. R. 1475, and cases there cited. It is clear that in so far as the defendants Onderdonk and Avery are concerned, and in so far as the prosecution of plaintiff in the courts by them is concerned, plaintiff has shown no ground for injunction. Nowhere are they given power to institute and/or prosecute either criminal or civil proceedings against plaintiff, and injunction does not lie against them to prevent that which they are without power to do. As was said in the Yarnell Case, supra, defendants Onderdonk and Avery have spoken, but not as one "having authority."

Besides, it is undisputed that Onderdonk and Avery have been removed from the valley to other parts, and, so far as this record shows, no one has been appointed to succeed them, and it clearly appears that the whole movement started by them against plaintiff has been dropped and abandoned. There is no evidence of present threats of any kind of action against plaintiff by any one. The function of an injunction is to afford preventive relief, and not to redress wrongs (grievous though they may be) already committed. Lacassagne v. Chapuis, 144 U. S. 119, 12 S. Ct. 659, 36 L. Ed. 368; Industrial Association v. United States, 268 U. S. 64, 45 S. Ct. 403, 69 L. Ed. 849.

■ 3. Neither does plaintiff show grounds for injunction against the District Attorney. There is no evidence that he has been requested by any one to take, or that he has threatened to take, or that he contemplates taking, action of any kind against plaintiff, either civil or criminal. Besides, the undisputed facts show all the business transactions of plaintiff to be in intrastate commerce, with none in either interstate or foreign commerce, and under subdivisions (b), (c), and (f) of section 703, title 15 USCA, the District Attorney may proceed only in those instances where the transactions are in interstate and/or foreign commerce.

■ 4. But plaintiff insists that under the declaratory judgment act (section 400, title 28 USCA), this court should examine the question of the constitutional validity of the National Industrial Recovery Act, and the code of the motor retailing trade, adopted thereunder, declare it invalid, and declare the rights and other legal relations thereunder of the parties hereto. The wording of the material portion of the declaratory judgment act (28 USCA § 400 (1) is as follows: "In cases of actual controversy the courts of the United States shall have power upon petition, declaration, complaint, or other appropriate pleadings to declare rights and other legal relations of any interested party petitioning for such declaration, whether or not further relief is or could be prayed; and such declaration shall have the force and effect of a final judgment or decree and be reviewable as such."

No court of the United States may entertain jurisdiction of a matter unless it be a case or controversy within the meaning of sections 1 and 2, article 3, of the Federal Constitution. See Nashville, C. & St. L. Ry. Co. v. Wallace, 288 U. S. 258, 53 S. Ct. 345, 77 L. Ed. 733, 87 A. L. R. 1191, for full review and discussion of the cases. This statute apparently narrows and restricts the jurisdiction of such courts to render declara-

tory judgments to cases of actual controversy.

Do the facts here show a case or controversy within the meaning of such article of the Constitution, and do they show an actual controversy within the meaning of such statute, not on September 10, 1934, when plaintiff's original bill was filed, but on November 19, 1934, more than two months later, when plaintiff, in its amended bill on which it stands, and upon which this case has been tried, invokes such statute?

Whatever may be said as to whether there was, or was not, such a controversy on September 10, 1934, it is clear that an entirely different state of facts existed November 19, 1934. The basis or root of the controversy, on September 10th, was the accusation by Onderdonk and Avery that plaintiff has violated the provisions of the code respecting hours of labor and wages of employees. The entire controversy arose out of this accusation. All threats of Onderdonk and Avery of court action against plaintiff, and all of their other acts, complained of by plaintiff, were incident to, and grew out of, such accusation. Almost immediately after plaintiff filed its original bill, Onderdonk and Avery were, by their superior officers, withdrawn from the valley, and sent elsewhere, and plaintiff has not since been molested by them. There is no evidence that they have been succeeded by others, nor has plaintiff been molested by others. It must be assumed that those in authority over Onderdonk and Avery reached the conclusion (as the facts here clearly show) that plaintiff was not guilty of a violation of the code, and/or that if guilty, it could not be prosecuted in the courts, because the transactions did not affect interstate or foreign commerce, and dropped and abandoned the whole movement against plaintiff begun by Onderdonk and Avery.

But plaintiff may say that while there is no controversy respecting plaintiff's violation of the code, there is still a controversy respecting the constitutional validity of the N. I. R. Act and the code.

Up to the time plaintiff was accused of violating the code, neither plaintiff nor its president, so far as this record shows, questioned the validity of either the N. I. R. Act or the code. Indeed, plaintiff had assented to the code, and plaintiff's president was aiding in its enforcement, and was pressing for the prosecution of others thereunder. It was when plaintiff was accused of a violation of the code that it began to claim invalidity. And even though no longer accused of violating the code, plaintiff is still insisting upon its invalidity and upon the invalidity of the N. I. R. Act. Defendants affirm their validity. Standing alone, this presents no "case," "controversy," or "actual controversy," but only a hypothetical controversy or question.

I am convinced that there is not presented by the facts here a case or controversy of which this court has jurisdiction, either under the Constitution or under the declaratory judgment statute. The case here is clearly distinguishable from the Nashville, etc., Co. v. Wallace Case, supra. It is probably not distinguishable from Black v. Little (D. C.) 8 F. Supp. 867.

5. It would ordinarily follow that plaintiff's bill would be dismissed for want of equity. In the Yarnell Case, supra, in which a similar holding of want of equity was made by the Court of Appeals, it was said: "It may be that appellants will undertake to go further than they have yet done and assume authority directly or as the Secretary's agents to stop shipments, to confiscate fruit, or to do something else which the Lake Fern Groves may conceive to be a violation of its constitutional rights. In order to provide against such a contingency and to enable the Lake Fern Groves to apply for relief promptly, we hold that it is proper for the District Court to retain its bill of complaint for necessary future amendment. The present interlocutory injunction should be dissolved."

Defendants may have their decree, dismissing plaintiff's bill, but with provision for future amendments by plaintiff, should a contingency such as is referred to in the Yarnell Case arise.

Let a decree be drawn and presented.