## UNITED STATES v. SAN FRANCISCO ELECTRICAL CONTRACTORS ASS'N, Inc., et al.

### No. 26893-R.

District Court, N. D. California, S. D.

Sept. 5, 1944.

58

James McI. Henderson and Joseph L. Alioto, Sp. Assts. to Atty. Gen., and Frank Loughran, Sp. Atty., of Oakland, Cal., Lawrence W. Somerville, Sp.Atty., of San Francisco, Cal., and Stephen Maffini, Sp. Atty., of Berkeley, Cal., all of Department of Justice, for the United States.

Harold C. Faulkner and Walter J. Walsh, both of San Francisco, Cal., for defendants San Francisco Electrical Contractors Ass'n, Inc., Electrical Industry Depository of California, Inc., H. S. Tittle Co., Inc., Frank J. Klimm Company, Inc.,

Enterprise Electric Works, Inc., Decker Electrical Const. Co., Inc., William J. Varley, Edward W. Scott, Carl C. Severin, George W. Abbett, George D. F. Smith, William Weindorff, James Galvin, Clyde L. Chamberlain, G. Walter Spencer, Bert J. Doherty, James Surtees, Charles C. McLean, Harold L. Hammond, Carl B. Kenney, Herbert A. Porter, Samuel M. Radelfinger, Edward Conroy, Victor Lemoge, H. C. Reid, Thomas Harris, George W. Brouillet, Edgar J. Douglas, and Peter Decker.

Edwin V. McKenzie and J. H. Sapiro, both of San Francisco, Cal., for defendants Local Union No. 6, International Brotherhood of Electrical Workers, Local Union No. 595, International Brotherhood of Electrical Workers, Samuel E. Rockwell, William A. Kelly, Joseph Nunan, Charles J. Foehn, J. R. Johnston, and D. W. Tracy.

James B. O'Connor, of San Francisco, Cal., and Roscoe D. Jones, of Oakland, Cal., for defendants Electrical Contractors' Ass'n of Alameda and Contra Costa Counties, Inc., Scott-Buttner Electric Co., Inc., Pacific Electric Motor Co., Inc., California Electric Co., Inc., Carl E. Gossler, C. D. Bronson, Archie R. Matson, Edward L. Buttner, and T. I. Rosenberg.

YANKWICH, District Judge.

The indictment, returned on March 2, 1940, charges, in substance, that certain unions combined with their employers to fix prices on electrical equipment moving in interstate commerce, to exclude such equipment from the San Francisco market and to increase the cost of electrical equipment moving in interstate commerce in that market in violation of Section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1. More particularly, it is averred that the defendants have been engaged continuously from January 3, 1938, to the date of the indictment "in an unlawful combination and conspiracy (a) arbitrarily, unreasonably, and unlawfully to increase, regulate, fix, dictate, and control the bids which all electrical contractors should submit to general contractors for the installation, alteration, and repair of electrical systems for the purpose of establishing arbitrary, collusive, and non-competitive bids, and (b) arbitrarily, unreasonably, and unlawfully to eliminate electrical contractors who refuse to participate in said bid-control scheme as prospective purchasers of electrical equipment shipped in interstate commerce into the San Francisco Bay Area; and (c) arbitrarily, unreasonably, and unlawfully to increase the cost of electrical equipment which has been shipped in interstate commerce into the San Francisco Bay Area and of the installation, alteration, and repair of aforesaid electrical systems to ultimate purchasers; and (d) arbitrarily, unreasonably, and unlawfully to restrict the amount and volume of electrical equipment shipped into the San Francisco Bay Area in interstate commerce from others of the United States."

The defendants fall, generally, into two groups—the employers or contractors, and the unions or employees. In the employer group are three associations, organized as corporations. One of the associations is known as the San Francisco Electrical Contractors Association; the second is known as the Electrical Contractors Association of Alameda and Contra Costa Counties; and the third is the Electrical Industry Depository of California. Other defendants in the employer group are corporations or individuals engaged in the business of electrical contracting.

In the employe group are two labor unions, Local No. 6, International Brotherhood of Electrical Workers, with headquarters at San Francisco, California, and Local Union No. 595, International Brotherhood of Electrical Workers, located at Oakland, California. Both are affiliated with the International Brotherhood of Electrical Workers.

Certain officials of the two local unions, and of the International are also made defendants.

A large portion of the electrical equipment, which goes into electrical installations, is manufactured outside the State of California by large national manufacturing concerns, and distributed in the state, through their local sales agents.

The contractors, in fulfilling contracts for installation, alteration or repair of electrical constructions and systems in buildings, stores, apartment houses, and private houses, purchase the materials which go into the building of the systems, such as cable, conduits, wire, panels, switches, switchboards, fuse boxes, and other apparatus, materials and fixtures, from local agents of these national concerns, or other jobbers.

The restraint of commerce which the government charges relates specifically to

the fixing of prices for this equipment in making bids for electrical work.

Some of the testimony introduced was admitted as to certain defendants only. The government, at the conclusion of its case, has moved to apply it to all.

The defendants resist this motion.

In turn, they have moved to limit the testimony so introduced to particular defendants, or, in the alternative, that the testimony be stricken as to the others.

At the same time, each defendant has requested a directed verdict, or, in the alternative, a dismissal, substantially upon these grounds:

"(1) The evidence is insufficient, as a matter of law, to warrant submission of the case to the jury.

"(2) The indictment fails to charge a violation of the Sherman Act, or of any other statute or law of the United States.

"(3) The evidence, as a matter of law, is insufficient to constitute a combination and/or conspiracy in restraint of interstate commerce, in violation of Section 1 of the Sherman Act, or any other section of the Sherman Act, or any other offense under any law of the United States.

"(4) The evidence fails to prove the offense set forth in the indictment.

"(5) If any conspiracies have been proven, legally or illegally, they are separate and distinct conspiracies and not the particular conspiracy charged in the indictment.

"(6) There is no evidence of a combination between either Local Union No. 595 or Local Union No. 6 of the International Brotherhood of Electrical Workers, or any of their officers or any officer of the International or the San Francisco corporations, or the San Francisco Electrical Contractors Association, or any individual firm in the San Francisco group with the Electrical Contractors Association of Alameda and Contra Costa Counties, and any of the east bay individuals or corporate defendants.

"(7) There is not sufficient evidence, as a matter of law, to sustain the charge that there was a violation of the Sherman anti-trust law in respect to any article of commerce moving between the States."

The sufficiency of the indictment need not be considered, a demurrer to it having been overruled.

The fundamental legal question which underlies the other motions is whether the evidence shows restraint of interstate commerce.

Having had occasion, in recent years, to consider the nature of the Sherman Anti-Trust law in a group of opinions (United States v. Heating Piping & Air Conditioning Contractors Ass'n, D.C., 1940, 33 F. Supp. 978; United States v. Food and Grocery Bureau, D.C., 1941, 41 F.Supp. 884; United States v. Food & Grocery Bureau, 1942, 43 F.Supp. 965; United States v. Food and Grocery Bureau, D.C., 1942, 43 F.Supp. 974), I shall not discuss again, in detail, its scope or the policy behind it.

■ The general aim of the statute is "to suppress combinations to restrain competition and attempts to monopolize by individuals and corporations" (Parker v. Brown, 1943, 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315), and thus maintain freedom of commerce between the states.

■ In interpreting the commerce clause of the Constitution of the United States, Art. I, Sec. 8, Cl. 3, the line of demarcation between interstate and local activities is gradually being obliterated by judicial decision. As the law now stands, activities strictly local which interfere with interstate commerce, come under the interdiction of the Act. See cases cited in United States in Heating Piping & Air Conditioning Contractors Ass'n, D.C.Cal., 1940, 33 F.Supp. 978; also, Albrecht v. Kinsella, 7 Cir., 1941, 119 F.2d 1003; Montrose Lumber Co. v. United States, 10 Cir., 1941, 124 F.2d 573; Truck Drivers' Local No. 421, etc., v. United States, 8 Cir., 1942, 128 F.2d 227.

■ Workmen have the right to organize.

Employers may combine for the mutual protection of their interests. Employers and employees may bargain collectively. They may, in so doing, or in enforcing their demands, by strikes, lockouts, restrictions on the use of men or equipment, affect the flow of goods in interstate commerce.

But all the late decisions agree that, in the light of the Clayton (29 U.S.C.A. § 52) and the Norris-LaGuardia (29 U.S.C.A. §§ 101–115) Acts, such results are not the direct interference with interstate commerce which the Sherman Anti-Trust Act forbids. See: New Negro Alliance et al. v. Sanitary Grocery Co., 1938, 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012; United States v. Hutcheson et al., 1940, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788; Apex Hosiery Co.

v. Leader, 1940, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; Milk Wagon Drivers' Union v. Lake Valley Farms Products, Inc., 1940, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63; United States v. Building, etc., Council, 1941, 313 U.S. 539, 61 S.Ct. 839, 85 L.Ed. 1508; United States v. United Brotherhood, etc., 1941, 313 U.S 539, 61 S.Ct. 839, 85 L.Ed. 1508; Blankenship v. Kurfman, 7 Cir., 1938, 96 F.2d 450; Wilson & Co. v. Birl, 3 Cir., 1939, 105 F.2d 948; United States v. American Federation of Musicians, D.C.Ill.1942, 47 F.Supp. 304, affirmed by memorandum, 1943, 318 U.S. 741, 63 S.Ct. 665, 87 L.Ed. 1120; United States v. Bay Area Painters, etc., Joint Committee, D.C.N.D.Cal.,1943, 49 F.Supp. 733, per St. Sure, J.

We apply these tests to the facts here.

The code of law of the contractors' associations, which the members were required to observe, called for registration, with the association, of every electrical installation job which cost more than fifty dollars. On failure to do so, the member might be fined, not less than ten, nor more than two hundred and fifty dollars. The members were required to use the prices set out in a Coast Electrical Price and Data Book. The book covered both materials and labor. Members using the book added fifty per cent to the cost of each in computing their bids.

■ Direct control of prices of articles moving in interstate commerce, no matter how achieved, either in the state of origin, or in the state of destination, is a restraint within the Sherman Act, because it eliminates competition. United States v. Univis Lens Co., 1942, 316 U.S. 241, 252, 62 S.Ct. 1088, 86 L.Ed. 1408; United States v. Masonite Corporation et'al., 1942, 316 U.S. 265, 276, 62 S.Ct. 1070, 86 L.Ed. 1461.

But we must refer to other facts before determining whether we have such a situation here.

A fine of ten per cent of the price of the particular job could be imposed for failure to use the price system described in the book.

The San Francisco Association sponsored and arranged meetings, known as engineering or quantity survey meetings, presided over by a survey chairman. The chairman would, sometimes, fix arbitrarily the price at which a job was to be done. Then he would allocate the job to a particular contractor, who would put in the low bid, and the other contractors attending the meeting would put in higher bids.

Each of the two contractors' associations entered into agreement with the labor union in its territory, which gave the members of the association preference in being supplied with labor over the non-members.

The business agents of the union urged contractors to join the association.

An added means for controlling bids was the bid depository plan. This plan was first carried out by the publisher of the price book, and then through the defendant Electrical Industry Depository of California, Inc., a corporation organized for the purpose.

It operated in this manner:

If the job was to be competitive, the contractor was required to secure a registry number from the registry office. The customer would then fix, through the registry office, a closing time for bids, failing which, the registry office would fix a date limit beyond which no bids would be received. After the closing time, the job and the prices became frozen for ninety days—no one being permitted to make another bid. In practical effect, the time limit compelled the customer to choose from the bids so frozen. For a ninety-day wait might interfere with his work-in-progress schedule, or delay unreasonably the completion of the structure for which electrical installations were sought.

Obedience to these provisions was secured through fines or awards of liquidated damages.

Even within this pattern, there was competitive bidding. The bidding, of course, was within the time limit and restricted to the bidders who bid within the time. The general contractor was not required to use the depository. If he did, he could award the contract to any bidder in the depository, high or low. If he did not, he was free to choose his bidder from "free-lance" electrical contractors.

When the bid was awarded, any bidder, who was a member of the depository, could ask for a review of the bid, by the association, in order to determine the reason for any great differential between the bids.

In many instances, on review, the committee traced the differential to additional engineering, or to differences in the interpretation of the specifications as to amount of equipment called for.

When the association found that there was violation, the case was sent to arbitration, in which proceeding, liquidated damages might be assessed against the offending bidder.

There is also evidence that failure to go through the depository system or acceptance of bids outside of it, or within the frozen period, resulted in threats by union representatives to withdraw union members from the job, or actual withdrawal until compliance or payment of fine.

The assistance of the local union in securing compliance with these practices of the contractors, at first, a mere matter of comity, was later, in 1939, reinforced by a contract between the local union and each contractor, requiring compliance by the contractor with the fair trade practice rules of the association. It is the contention of the government that the evidence shows approval of this form of contract by the International Brotherhood, through the defendant D. W. Tracy, its president.

The business managers of the two local unions, in securing a contractor's agreement to the contract with the union, would expresss the union's approval of the depository plan. Violation of the depository plan's rules might result in withdrawal of union labor from the job. In one instance, at least, there is evidence that the business agent of one of the local unions threatened not merely to "pull" the job, but to "pull" the shop of a contractor—i. e., deny him union labor on all his electrical jobs, because he would not settle his controversy with another contractor, arising from his alleged disregard of the depository rules.

What precedes delineates the scheme charged in the indictment in a manner as favorable to the government's theory of the case as can be drawn justly or inferred legitimately from the evidence introduced thus far.

■ To sustain a prima facie case, the government's evidence must be substantial. But when this requirement is met and a motion to dismiss or to direct a verdict is before the court, there still remains the question:

Is the evidence legally sufficient to sustain a verdict of guilty, if one were rendered by the jury? See: Vilson v. United States, 9 Cir., 1932, 61 F.2d 901; Hemphill v. United States, 9 Cir., 1941, 120 F.2d 115, 117; Suetter v. United States, 9 Cir., 1944, 140 F.2d 103, 107.

Specifically, in this case, the inquiry is:

Does the evidence show a violation of the Sherman Anti-Trust law, through direct control of prices, resulting in an increase in cost to the consumer, and restricting the amount of electrical equipment shipped into the San Francisco Bay Area in interstate commerce from other states?

■ Before answering this question, we quote a most inclusive definition of interstate commerce:

" * * * Interstate commerce consists of intercourse and traffic between the citizens or inhabitants of different states, and includes not only the transportation of persons and property, and the navigation of public waters for that purpose, but also the purchase, sale, and exchange of commodities. Gloucester Ferry Co. v. [Commonwealth of] Pennsylvania, 114 U.S. 196–203, 5 S.Ct. 826, 29 L.Ed. 158–161, 1 I.C.C. 382; Kidd v. Pearson, 128 U.S. 1, 20, 9 S.Ct. 6, 32 L.Ed. 346, 350, 2 I.C.C. 232. If, therefore, an agreement or combination directly restrains not alone the manufacture, but the purchase, sale, or exchange of the manufactured commodity among the several states, it is brought within the provisions of the statute. The power to regulate such commerce, that is, the power to prescribe the rules by which it shall be governed, is vested in Congress, and when Congress has enacted a statute such as the one in question, any agreement or combination which directly operates, not alone upon the manufacture, but upon the sale, transportation, and delivery of an article of interstate commerce, by preventing or restricting its sale, etc., thereby regulates interstate commerce to that extent, and to the same extent trenches upon the power of the national legislature and violates the statute." Addyston Pipe & Steel Co. v. United States, 1899, 175 U.S. 211, 20 S.Ct. 96, 107, 44 L.Ed. 136.

And see: Loewe v. Lawlor, 1908, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815.

■ Trade includes " * * * not only the business of exchanging commodities by barter, but the business of buying and selling for money, or commerce and traffic generally." May v. Sloan, 1879, 101 U.S. 231, 237, 25 L.Ed. 797.

■ We advert briefly to the immunity which attaches to certain activities of employers and employees, working separately or in concert. Acts of employers seeking

control of a trade through the open shop (Industrial Ass'n of San Francisco v. United States, 1925, 268 U.S. 64, 45 S.Ct. 403, 69 L.Ed. 849) or of employes to achieve a like control through the closed shop (United Leather Workers' International Union v. Herkert & Meisel Trunk Co., 1924, 265 U.S. 457, 44 S.Ct. 623, 68 L.Ed. 1104, 33 A. L.R. 566; Levering & Garrigues Co. v. Morrin, 1933, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062), or other indirectly restrictive practices of employers (Anderson v. United States, 1898, 171 U.S. 604, 19 S.Ct. 50, 43 L.Ed. 300), or unions (Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; United States v. Hutcheson et al., 1940, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788; United States v. American Federation of Musicians, D.C.Ill.1942, 47 F.Supp. 304), including prevention of use of machines and appliances originating in interstate commerce (United States v. Carrozzo, 1941, D.C.Ill., 37 F.Supp. 191; United States v. Bay Area Painters, etc., Joint Committee, D.C.N.D.Cal., 1943, 49 F.Supp. 733, per St. Sure, J.), are immunized by the impact of the Clayton and Norris-LaGuardia Acts on the Sherman Anti-Trust law, or by judicial decisions preceding or following the enactment of the first named acts.

■ However, boycotts, or other discriminatory practices, such as stoppages or direct agreements not to work on equipment or materials originating outside of the state, or to give preference to local products are not immune. United States v. Heating Piping & Air Conditioning Contractors Ass'n, D.C.Cal., 1940, 33 F.Supp. 978; United States v. Local Union No. 3 of International Brotherhood of Electrical Workers et al., D.C.N.Y., 1941, 42 F.Supp. 783; United States v. New York Electrical Contractors Ass'n, D.C.N.Y., 1941, 42 F. Supp. 789.[1]

Our own Circuit Court of Appeals in Lumber Products Ass'n, Inc., v. United States, 9 Cir., 144 F.2d 545, has applied these norms to a combination between labor unions and employers, the object of which was *not* to regulate conditions of labor which might incidentally affect commerce indirectly, *but to monopolize interstate commerce*. So doing, the court drew the line strictly between the licit and illicit in contracts of this character. The court,

speaking through Denman, Circuit Judge, said:

"We agree with the government that the charges of the indictment and the factual allegations made in their support are *not of a restraint upon commerce merely incident to the ordinary disruption of the production of any employer,* arising out of a protracted labor dispute and necessary to the achieving of a legitimate objective of organized labor. Rather there is here alleged a combination for a direct restraint upon commerce with an objective of destroying the competition of that commerce and permitting the fixing and maintenance of the local area prices at an arbitrary, artificial and non-competitive level. It is such intended restraints for such an objective at which the sanctions of the Sherman Act are directed. * * *

"Because organized labor may lawfully strike, picket or boycott in support of its demands for higher wages which an employer may or may not be able to pay, it does not follow that labor and the employer may agree to use these weapons to destroy the competition of interstate commerce and give the employer a monopoly price raising contract and thereafter 'split the take.' " (Italics added)

Elsewhere in the opinion, Judge Denman uses this emphatic language:

"Here the Manufacturer Group and the Union Group are no longer 'participating or interested in a labor dispute' as that term is used in § 5 of the Norris-LaGuardia Act. The dispute is past. The labor and non-labor groups are combined. The acts described in § 4 of that Act and section 20 of the Clayton Act, some of which are charged in the indictment here to have been committed by the now non-disputant unions and their members and their manufacturing employers are not to secure any legitimate advance of the laborer's interest. *They are squeezing implements to extort what, in effect, is a capital levy on the home builder and other consumers."* (Italics added.)

Theoretically speaking, there was no labor dispute here. But, *clearly*, each union was bargaining collectively with each contractor. They were binding themselves by mutual undertakings relating, *not exclusively* to the depository scheme, but to conditions of employment generally.

---

[1] In the latter two cases, which involved electrical trade, the indictment charged *explicitly* refusal to work on any but electrical equipment manufactured or assembled in New York City.

The requirement as to the observance of the depository rules was one of forty-two clauses contained in the agreement. It was not even referred to by name, but was included in a *single clause, general in character,* in which the employer agreed to comply with "all Fair Trade Practice Rules of the Electrical Contractors Association of Alameda and Contra Costa Counties, in accord with the laws of the State of California." Agreement, Art. II, Sec. 2(e).

Of course, the written agreement of 1939 need not be accepted as the sole measure of the actions of the defendants. What was done before must be taken into consideration, in order to determine, whether, *under the guise of employer-employe commitments,* the contracting parties were, in reality, combining to restrain commerce, as the court found in the "Lumber Products" case.

But what distinguishes this case from that and other cases of this character is the *total absence* of restrictive features, such as agreements *not to work, or actual refusal to work,* on electrical equipment originating out of the state.

The indictment, it is true, charges one of the objects of the combination to have been, "(d) * * * arbitrarily, unreasonably, and unlawfully to restrict the amount and volume of electrical equipment shipped into the San Francisco Bay Area in interstate commerce from others of the United States." Paragraph 22 of the indictment. But there is no evidence showing any direct or actual stoppage. On the contrary, another paragraph in the indictment indicates conclusively that what the government had in mind was not such direct stoppage, but only the consequential effect claimed to flow from price increases.

Paragraph 15 of the indictment reads:

"The prices charged by electrical contractors for the installation, alteration, or repair of electrical systems have a direct and substantial effect upon the volume of electrical equipment moving in interstate commerce into the San Francisco Bay Area. The higher the prices charged by electrical contractors for electrical equipment used to install, alter, and repair electrical systems, the smaller is the volume of electrical equipment shipped in interstate commerce into the San Francisco Bay Area."

No direct evidence of such effect or result was put into the record. Nor can it be inferred from the facts. On the contrary, the evidence shows that the manufacture of electrical equipment entering the state is controlled by three or four large, nation-wide manufacturers. The quantity of materials they ship to their sales agencies, and the prices at which they sell them have not been shown to be affected by any agreement between electrical contractors and unions.

In fact, it was testified that public utilities are among the largest purchasers of some of the heaviest and costliest equipment, such as cable, transformers and the like.

But even if *such result* could be deduced, by inference, from the facts in the case, *it was not* the product of any combination to fix prices of electrical equipment. It was, at best, the consequential, remote and unsubstantial result of a legitimate refusal of electrical contractors, aided by the unions, to undertake composite electrical construction work, except in strict observance of, and compliance with, certain standards and practices which do not, *in themselves,* or *in their effect,* do violence to the freedom of commerce which the anti-trust acts seek to insure.

And even this conclusion is grounded upon the assumption, *not supported in the record,* that the evidence shows concert of action between all the named groups and individuals, who are made defendants in this case.[2]

But assume that, at least as to the group defendants and their officers, concert of action existed, what was its effect, as shown by the evidence?

Merely that bidding for electrical work within a limited area was controlled *artificially* through the depository system.

---

[2] The evidence does not show concert of action between the San Franicsco group and the East Bay group. Rather, it discloses that each group of employers and employes acted within its own areas. And the mere fact that they followed the same pattern and that some members of the San Francisco employer group helped the Oakland and Contra Costa group establish a depository system of their own, does not prove *one conspiracy.*

Nor is the fact that the International approved the form of the agreement with both employer groups, by endorsing, indirectly, the "depository" system, constitute the binding tie which makes all parties *to one agreement.*

But the contractors *did not sell* electrical supplies to the public or to general contractors. They built, what the indictment calls, "electrical systems", which it defines as "that *combination* of electrical equipment by which electric current is carried into and distributed through residences, apartment houses, and other types of buildings within the San Francisco Bay Area." (Italics added)

Many of the articles which went into the construction of these systems originated in interstate commerce. They were shipped by the manufacturers to their agents, upon whose local shelves they rested until purchased by electrical contractors to be used in assembling or building the electrical systems.

At times, some articles were shipped direct from the manufacturers to a contractor. But this was done through the local sales agent, who billed the contractor for them.

Adopting a broad view of the doctrine of the continuity of the flow in interstate commerce (Local 167 of I. B. of Teamsters, etc., v. United States, 1934, 291 U.S. 293, 297, 54 S.Ct. 396, 78 L.Ed. 804), there is no such continuity here.

*The electrical contractor does not buy articles in interstate commerce for resale. He buys them locally, for his own use in building electrical systems.*

When he bids on a job, he agrees to install an electrical system. His charges are for the completed system. Into the making of his price go electrical articles, cost of the labor of others, his own engineering skill in installing the various parts and combining them into a working whole, his own cost of doing business, and his profits of management.

In other words, the electrical contractor processes the electrical articles into a combination which he sells at a price, in which enters *as only one* of the elements, the price of the articles.

When articles originating in interstate commerce thus become co-mingled in a locally completed process, *they are not* in the flow of commerce.

The continuity is broken, if not when they reach the shelves of the manufacturer's agent, *at the latest when they are purchased from* him by the contractor, not for resale, but for processing.

As said in Levering & Garrigues Co. v. Morrin, 1938, 289 U.S. 103, 107, 53 S.Ct. 549, 551, 77 L.Ed. 1062:

"Use of the materials was purely a local matter, and the suppression thereof the result of the pursuit of a purely local aim. Restraint of interstate commerce was not an object of the conspiracy. Prevention of the local use was in no sense a means adopted to effect such a restraint. It is this exclusively local aim, and not the fortuitous and incidental effect upon interstate commerce, which gives character to the conspiracy. Compare Bedford [Cut Stone] Co. v. [Journeymen] Stone Cutters' Ass'n, 274 U.S. 37, 46, 47, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791; Anderson v. Shipowners' Ass'n, 272 U.S. 359, 363, 364, 47 S.Ct. 125, 71 L.Ed. 298. If thereby the shipment of steel in interstate commerce was curtailed, that result was incidental, indirect, and remote, and, therefore, not within the anti-trust acts, * * *."

And see: Industrial Ass'n of San Francisco v. United States, 1925, 268 U.S. 64, 45 S.Ct. 403, 69 L.Ed. 849.

If processing and control before an article enters interstate commerce, although "preparatory to interstate sale and shipment" is outside of that commerce (See Parker v. Brown, 1943, 317 U.S. 341, 361, 63 S.Ct. 307, 318, 87 L.Ed. 315), why should "processing" after the interstate journey is at an end be treated differently?[3]

---

[3] I treated this subject fully in my dissent in Brown v. Parker, D.C.1941, 39 F.Supp. 895, 903. The Supreme Court upheld these views in Parker v. Brown, supra.

By "processing" I really mean "construction."

In the strictly "processing" cases, there is no "building" of a system. There is but a change in an object which continues to retain its identity, such as the slaughtering and dressing of chickens, the dressing of furs, the grinding of a lens from a lens blank, or the cleaning, stemming or packing of raisins.

See: Live Poultry Dealers' Protective Ass'n, 2 Cir., 1924, 4 F.2d 840; Greater New York Live Poultry Chamber of Commerce v. United States, 2 Cir., 1931, 47 F.2d 156; United States v. International Fur Workers Union, 1938, 2 Cir., 100 F.2d 541; United States v. Univis Lens Co., 1943, 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408; Parker v. Brown, supra.

Here there is the construction of a system, which in its very making became a part of a building to which it was attached. By the law of fixtures, it became a part of the land on which the building stood. Certainly, the "system" could not be the ob-

Limitations of bidding as to time and persons, are no more a restraint on interstate commerce than is territorial restriction of outlets for dealing in articles originating in interstate commerce, such as automobiles, and the servicing and selling of supplies. Boro Hall Corporation v. General Motors Corporation, 2 Cir., 1942, 124 F.2d 822, 824; Boro Hall Corporation v. General Motors Corporation, 2 Cir., 1942, 130 F.2d 196, 197.

The language used by Augustus N. Hand, Circuit Judge, in the second opinion (on rehearing), is very apposite here:

"Taking the plaintiff's affidavits on its motion at their face value, there can be no doubt that there was *ample competition* in the *low-price car field* in Brooklyn. If the Company's policy interfered with sales of used cars by the plaintiff, *it also protected the latter against maintenance of used car outlets by other Chevrolet dealers outside of their respective zones.* Perhaps the plaintiff's zone of influence was an undesirable one for the sale of used cars, because the majority of customers would make such purchases during evenings or on week-ends, and most of the prospective customers within the territory were there only on business during business hours. But the effect of the restriction, if it had any, would be to throw the sale of used cars to dealers more favorably situated, who in turn would be able to increase their sales of new cars because of their added ability to dispose of cars taken in trade. If the location of their territories was better than that of the plaintiff's, this superiority would not be a burden upon sales of Chevrolet cars in interstate commerce as a whole, for anything the plaintiff lost the other dealers would gain. The proof shows that if the plaintiff could have selected a site for a used car outlet where any gain on its part would not have represented another dealer's loss the selection would have been acquiesced in." [4] (Italics added)

And see: B. S. Pearsall Butter Co. v. Federal Trade Commission, 7 Cir., 1923, 292 F. 720.

So here, the most that the depository system achieved was to substitute *limited and restricted* for *unlimited and unrestricted bidding.* It did not prevent an electrical contractor from doing business as a "free lance" outside the depository system. The record shows that many *did* so, without hindrance either from the contractors or the unions.

What is more, the result achieved involved neither commerce nor the restriction of it through price control or obstruction of flow of electrical materials in interstate commerce. "Where the subject-matter of the agreement does not directly relate to and act upon and embrace interstate commerce, and where the undisputed facts clearly show that the purpose of the agreement was not to regulate, obstruct, or restrain that commerce, but that it was entered into with the object of properly and fairly regulating the transaction of the business in which the parties to the agreement were engaged, such agreement will be upheld as not within the statute, where it can be seen that the character and terms of the agreement are well calculated to attain the purpose for which it was formed, and where the effect of its formation and enforcement upon interstate trade or commerce is, in any event, but indirect and incidental, and not its purpose or object." Anderson et al. v. United States, 1898, 171 U.S. 604, 19 S.Ct. 50, 54, 43 L.Ed. 300.

If we were dealing with the sale of articles, under the practices common in such cases, we would expect the contractor to account to the customer, be he a general contractor or a member of the buying public, for any materials *estimated but not used* in the completion of the job, either by turning them over to him for his own use or disposition, or by giving him credit for their value by deduction from the contract price. But it is clear that no one working under the depository scheme ever did this. On the contrary, such surplus was retained

---

ject of interstate commerce, for it was never in it. It came into being locally in the state, and never had a detached existence, rendering it capable of *being traded in interstate commerce,* although some of its parts originated in it.

[4] The Supreme Court, by denying certiorari in the case, 1943, 317 U.S. 695, 63 S. Ct. 436, 87 L.Ed. 556, has approved the conclusion that an agreement of this character does not monopolize trade. What adds strength to this case is the fact that the courts had previously found the same defendants guilty of other monopolistic practices in a prosecution under the Sherman Anti-Trust law. United States v. General Motors Corporation, 1941, 7 Cir., 121 F.2d 376, certiorari denied, 1942, 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497.

by the electrical contractor who returned it to his own shop or storage place for future use, *in other work*. This, although, in figuring the work, the electrical contractor had included in his price, the cost of this material *which he did not use*.

The parties were contracting with reference to California law.

 Under it, as under the law of sales generally, title to the goods passed *at once* to the buyer if the agreement was executed, or *on fulfillment of the contract,* if the agreement was executory. McKinney v. Sargent, 1932, 216 Cal. 18, 13 P.2d 373; Hatch v. Standard Oil Co., 1879, 100 U.S. 124, 25 L.Ed. 554; Louisville & N. R. Co. v. United States, 1924, 267 U.S. 395, 45 S.Ct. 233, 69 L.Ed. 678.

 It is also the rule in California and elsewhere that an agreement to build a structure according to another's plans and specifications *is not an agreement of sale* of any of the materials which may enter into its composition. Flynn v. Dougherty, 1891, 91 Cal. 669, 27 P. 1080, 14 L.R.A. 230; Golden E. M. Co. v. Old Homestead Bakery, 1922, 59 Cal.App. 541, 545, 211 P. 56; Mitchell Camera Corp. v. Fox Film Corp., 1937, 8 Cal.2d 192, 199, 200, 64 P.2d 946; Sidney Stevens Implement Co. v. Hintze, 1937, 92 Utah 264, 67 P.2d 632, 635, 636, 111 A.L.R. 331.

In General Shale Products Corp. v. Struck Const. Co., 6 Cir., 1942, 132 F.2d 425, 428, the question before the court was whether in the letting of a construction contract, there had been discrimination in the sale or purchase of bricks, in violation of the Robinson-Patman Act, § 1, 15 U.S.C.A. § 13. The Court held that the bricks *could not be* segregated from the construction work on which the contract or bid was made, saying:

"The Struck Company did not sell the brick in question to the Commission, and cannot be held guilty of discriminating in prices between different purchasers as a consequence of the transaction. The object of the Commission was to secure *the construction* of extensive housing facilities. The Struck Company *made a lump sum bid* for the entire work, and it also made an alternate bid, in which Speedbrik was specified in place of face brick and tile. The Commission decided against Speedbrik. While the contract provided that a credit would be given, or a charge made, to the Commission, dependent upon whether the brick cost more or less than $20.00 per thousand, and also provided that the general bid would be decreased by $13,000 in case Speedbrik were selected by the Commission instead of brick and tile, nevertheless, the contract could not be said to be one for the sale of brick. The Commission would not be required to pay for a delivery of brick; and payments were made by the Commission to the Struck Company on the basis of the proportionate performance of the contract.

"It is true that the cost of the brick was segregated for the purpose of showing how much would be the difference in the cost of the entire work, to the Commission, if brick were used instead of Speedbrik. But the alternate bid was limited to this purpose, and the transaction, eventually completed, was not divisible into a contract for work and labor, and a contract for the sale of brick. Nor is the situation changed by the fact that the Struck Company quoted brick prices to the Commission in order to secure its acceptance of this material. *The total sum of the main bid was, by agreement, dependent upon the cost of the brick. It was only one of the factors in the cost of constructing a project in its entirety."* (Italics added)

All these considerations serve to stress the danger of over-simplification, in the field of human endeavor. You cannot take a composite process of construction and the contractual dealings leading to its achievement, split them into their component elements, choose one of them, and, by withdrawing it from the combination, give to it a separate being. When you do this, you substitute unrealistic abstraction from the realm of reality. For the element thus sought to be segregated has no such separate existence. It is but a segment of the whole. In order to consider the fragment here chosen (*the price of materials*), and reduce the entire process (*agreements for electrical construction*) to it, we would have to practice this kind of unreal cleavage.

We should not do this because there is no separate or separable price fixing of electrical materials antecedent to their resale to the public.

We have only a computation of prices.

Concede that it was made according to formula described in the Price and Data Book, and that it would fall under the interdiction of the price-fixing cases adverted to, if it were a separate transaction. Yet,

*it is not such,* but is a part of a broader undertaking to do electrical construction, in the completion of which the materials may be used. It is integrated into the whole and cannot be severed from it.

The weaver may weave many strands into his web; each may add to the pattern, but the product of the loom is the completed fabric.

And the files of the San Francisco Association, on review of bids on complaints of unsuccessful bidders, lend support to these conclusions.

In many instances, the association, on such review, determined that the differential was due, not to failure to use the Price and Data Book, but to additional engineering, or to differences in the interpretation of specifications.

Thus, in one instance, the disparity was traced to a smaller number of electrical circuits figured on by the successful bidder. In another, the difference was accounted for by bus service. In still another, *in which there were six bidders,* the discrepancy arose *because three bidders had surveyed the job before bidding, and three had not.*

On a fourth, there was a substitution in the kind of switches called for in the bid, and certain feeders were overlooked. The low bid reflected these substitutions and omissions.

In still another case, a large differential was due to the fact that, whereas most of the bidders had estimated a coupler at the standard price of $425, the successful bidder bid on the basis of a coupler which he, himself, had built at a cost of $125.

Other records on review tell the same story.

■ They sustain the view that we are not dealing here with the resale of equipment, but with contracts for composite electrical construction and installation, in which the price charged for materials used was only one part of the cost.

If it were permissible to thus follow an article into commerce, a group of cabinet makers could be prosecuted for including in the cost of a piece of furniture, a fixed price on some of the hardwood which went into its making.

And yet, what the cabinet maker resells is not the unfinished lumber, but other materials, and, *above all,* the skill of the craftsman. More important, what the customer buys is not the lumber, but the finished product. At that, lumber retains more of its individuality in a piece of furniture than do the various parts worked into electrical construction.

Hence the conclusion that, assuming that the evidence shows the fixing of prices on articles *originating* in interstate commerce, *they had ceased to be a part of that commerce* when this was done.

It is inconceivable that employers and employes should not be able to join in exercising control over bidding in order to stabilize a purely local industry or craft, when by so doing they are not increasing the resale price of a specific article originating in interstate commerce, but, *at most,* limiting the sales-field of a manufactured structure, into the making of which enter not only separate parts which may have once been in interstate commerce, but a combination of many of them, rebuilt into a whole, by the skills and craftsmanships of both management and labor.

The interference with interstate commerce, if any results from this, is indirect and unsubstantial, and not of the character forbidden by Section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1.

On the whole, I think that judicial precedents interpreting this Act and the more recent legislation related to it (some of the most important of which were announced after this prosecution was instituted), and the social goal behind this body of legislation (*the maintenance of freedom of commerce between the states),* stand in the way of its extension into the field which this prosecution seeks to invade.

■ I may add that as to some of the individual defendants, the rules of agency in criminal law, which I declared in United States v. Food and Grocery Bureau, D. C., 1942, 43 F.Supp. 966–971, forbid us holding them criminally responsible for the acts of their groups which they did not either commit, counsel, encourage or direct.[5]

[5] This, despite the liberal rule of "liability through association" adopted in such cases. United States v. Masonite Corporation, 1942, 316 U.S. 265, 275, 62 S.Ct. 1070, 86 L.Ed. 1461. But see United States v. International Fur Workers Union, 2 Cir., 1938, 100 F.2d 541, 547.

To illustrate: D. W. Tracy was the president of the International. Under date of April 9, 1939, J. Scott Milne, vice-president of the International, and not a defendant, in a letter to Tracy forwarded the proposed agreement between Local Union No. 595 and individual employers. Tracy's reply, dated April 25, 1939, with his "facsimile" signature, was admitted in evidence under the "reply letter" theory expounded by me in People v. Rosenbloom, 1931, 119 Cal.App.Supp. 759, 768, 769, 2 P.2d 228.

· The proposed agreement dealt, generally, with the conditions of employment under a closed-shop—hours, wages, apprenticeships and the like. The reference to to the "depository" scheme is contained in subsection (e) of Section 2, of Article II, which reads:

"(e) Employers shall comply with all Fair Trade Practice Rules of the Electrical Contractors Association of Alameda and Contra Costa Counties, *in accord with the laws of the State of California.*" (Italics added)

Neither Tracy nor the International participated in any of the negotations between the locals and the contractors. Approval of the form of the contract by an officer of the International was sought, because of the requirement of Section 7 of Article XVIII of its Constitution, which reads:

"Sec. 7. L.U.'s are empowered to make their own By-Laws and working rules— but these shall in no way conflict with this Constitution. Where any doubt appears, this Constitution shall be supreme. All By-Laws, amendments and rules—all agreements, jurisdiction or otherwise, of any kind or nature—shall be submitted in duplicate form to the I.O. for approval. No L.U. shall put into effect any By-Laws, amendment, rule or agreement of any kind without first securing such approval. All these shall be null and void without I.O. approval. The I.O. has the right to correct any By-Laws, amendments, rules or agreements to conform to this Constitution and the policies of the I.B.E.W."

There is no evidence that Tracy wrote the letter. The identifying initials on it are not his. This, in view of ordinary business practice, would indicate that he did not even dictate the letter. Nor does the record show that he affixed his signature to it. On the contrary, the evidence shows clearly that there were at least six persons in the International's office at Washington, D. C., who had authority to affix his facsimile signature to any document which he was required to sign.

In Lumber Products Association, Inc., v. United States of America, supra, the Court held that the participation of the vice-president and field representative of an international union in the negotiation of the agreement, and its approval by its officers, warranted a jury in finding participation by the officers and the union in the scheme which resulted. But here, there is nothing but the bare approval, *through a rubber stamp,* of a lengthy agreement regulating conditions of labor, which contained the almost innocuous requirement of compliance by the employer with the "Fair Trade Practice Rules" of the Electrical Contractors Association of the counties involved, *"in accord with the laws of the State of California." It is not shown that Tracy had ever seen a copy of the rules or knew what they were.*

It is not the policy of the law to hold either individuals or groups criminally liable, unless their activities show clearly an intention to commit, aid, advise or encourage, willfully and intentionally, a criminal act. People v. Armentrout, 1931, 118 Cal.App.Supp. 761, 1 P.2d 556; United States v. Food and Grocery Bureau of Southern California, D.C.S.D.Cal., 1942, 43 F.Supp. 966–971; Truck Drivers' Local No. 421 v. United States, 8 Cir., 1942, 128 F.2d 227, 236.

In view of the conclusion reached on the basal issues in the case, it is not necessary to determine whether the application of these principles to other individuals or groups might result in similar exoneration.

The conclusion reached calls for a denial of the government's motion to apply the testimony to all the defendants and the granting of the motions of the defendants to strike and to dismiss. It is so ordered.

The cause is dismissed as to each defendant and the jury is discharged.